## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

JAMES SULLIVAN,

      Plaintiff,

v.

TOWN OF BARNSTEAD, PAUL POIRER
and
DIANE BEIJER,

      Defendants.

**CIVIL CASE NO.**

### COMPLAINT AND DEMAND FOR JURY TRIAL

James Sullivan ("Sullivan" or "Plaintiff") by and through his attorney, KBV Law, complains against the defendants the Town of Barnstead, New Hampshire, Police Chief Paul Poirier, individually and in his official capacity, and Diane Beijer, the Chair of the Barnstead Board of Selectman, individually and in her official capacity, as follows:

### NATURE OF ACTION

The Plaintiff, James Sullivan, seeks to recover damages from the defendants, the Town of Barnstead, New Hampshire ("Barnstead" or the "Town"), Police Chief Paul Poirer ("Poirier" or "Chief"), and Diane Beijer ("Beijer") (collectively referred to herein as "Defendants"). Defendants caused Sullivan to suffer damages including lost income, lost benefits, emotional distress, reputational harm, and expenses he would otherwise not have incurred. Defendants either personally acted to destroy Sullivan's law enforcement career and reputation, or sanctioned, oversaw, aided and abetted, conspired, or tolerated such conduct against Sullivan; Defendants retaliated against Sullivan for reporting unlawful activity including the unlawful use of public resources;

published false, slanderous, and libelous allegations against Sullivan; caused a false allegation of criminal conduct on the part of Sullivan to be referred to the Office of the Attorney General for the State of New Hampshire; and conspired and fabricated evidence, denying Sullivan a legitimate opportunity to be heard, interfering with his employment, and depriving Sullivan of his liberty and property interests that are protected by law and the constitutions of New Hampshire and the United States. As a result of Sullivan's unlawful termination from the Barnstead Police Department, he has been excluded from the profession he worked in for more than twenty (20) years.

## PARTIES

1.    Plaintiff James Sullivan ("Sullivan" or "Plaintiff") is a police officer with more than twenty years of experience, currently residing in Merrimack, New Hampshire.  At all times material to this action, Sullivan was employed as a police officer for the Town of Barnstead, New Hampshire Police Department and resided at 26 Fern Avenue, Gilmanton, New Hampshire 03237.

2.    The Town of Barnstead ("Barnstead") is a municipal corporation and a body politic with an office located at 108 South Barnstead Road, Barnstead, New Hampshire, 03225.

3.    Paul Poirier ("Poirier") is a natural person with a residence located at 13 Chatfield Drive, Litchfield, New Hampshire 03052. Poirier is, and at all times material to this action has been, the Chief of the Police Department for Barnstead.

4.    Diane Beijer ("Beijer") is a natural person with a residence located at 1207 Suncook Valley Road, Barnstead, New Hampshire 03225. Beijer is, and at all times material to this action has served as an elected member of the Board of

Selectman for Barnstead. Beijer is currently the Chair of the Barnstead Board of

Selectman ("BOS"), a position she also held at times relevant to the allegations herein,

specifically March – June 2021.

5.    At all times material to this action the Barnstead was an "Employer" as

defined by RSA 275-E:1.

6.     At all times material to this action Sullivan was an "Employee" as

defined by RSA 275-E:1.

## JURISDICTION AND VENUE

7.    This Court had jurisdiction over this case pursuant to 28 U.S.C. §§ 1331

(federal question), 42 U.S.C. § 1985 (civil rights), 28 U.S.C. § 1343 (civil rights), and the

1st, 5th, and 14th Amendments to the Constitution of the United States of America. The

Court has supplemental jurisdiction pursuant to 28 USC § 1667, for claims arising

under the laws of the State of New Hampshire.

8.    Venue in this Court is appropriate pursuant to 42 U.S.C. § 1983, 42

U.S.C. § 1985, and 28 U.S.C. §1391, because the acts complained of in this dispute

occurred in Barnstead, New Hampshire, and all parties that are natural persons reside

within the jurisdiction of the District of New Hampshire.

## STATEMENT OF CLAIMS

9.    Sullivan was first employed as a police officer in or around April 2000 in

the Town of Merrimack Police Department. Sullivan worked for the Merrimack Police

Department until in or around January 2019.

10.    From approximately April 2000 until his retirement in 2010, Poirier was

Sullivan's colleague in the Merrimack Police Department.

11.    Sometime after leaving the Merrimack Police Department, Poirier joined the Town of Barnstead Police Department as its Chief.

12.    From in or about 2018, to in or around January 2019, Poirier recruited Sullivan to join the Barnstead Police Department ("BPD" or the "Department") as a full-time police officer in the position of Detective Sergeant. On or about January 30, 2019, Sullivan was sworn as a member of the BPD.

13.    In September 2019, Sullivan purchased and moved into a home in Gilmanton, New Hampshire, so he could be closer to work at BPD.

14.    As Detective Sergeant, Sullivan's responsibilities included handling detective cases, grooming detective assistants, training new patrol officers, supervising officers and shifts, and overseeing the implementation of a formal Field Training Officer program at BPD.

15.    Sullivan also served as second in command to Poirier, covering oversight responsibilities in Poirier's absence such as supervising other Department personnel, reports and cases. Sullivan enjoyed administrative rights in the BPD computer system, including IMC, the public safety data management software utilized by the Department for all of its case documentation, reporting, and records management, in order to carry out those responsibilities.

16.    In 2019, Sullivan also took over responsibility for creating the Department's work schedule. This means that Sullivan was responsible for assigning the Department's officers to the various shifts that needed to be staffed each week.

17.    Prior to taking over responsibility for the schedule, Sullivan received many complaints from other officers regarding Poirier's handling of the schedule. In

particular, Poirier seemed to struggle with understanding how a 24-hour clock worked on a schedule.

18.     Upon information and belief, Sullivan managed the schedule more efficiently than Poirier and saved Barnstead money by reducing overtime costs.

19.     Throughout Sullivan's employment, the Department was chronically short-staffed.

20.     The BOS was at all times relevant hereto, aware that BPD had an issue with retaining employees and maintaining appropriate staffing levels.

21.     Turnover among police officers in Barnstead was extremely high. Other police officers complained to Sullivan about Poirier's leadership, which included targeting, intimidation, bullying, and observing them from his home via the security camera system and then questioning their decisions and writing them up unnecessarily.

22.     Throughout his tenure, Sullivan observed or became aware of multiple instances where Poirier violated, or caused another officer to violate, a Department policy or rules and regulations promulgated by the New Hampshire Police Standards and Training Council ("PSTC").

23.     In addition, Poirier's hiring decisions throughout Sullivan's employment often failed to adhere to guidelines or universally accepted "best practices," at times leaving the Department without sufficient personnel to patrol the streets and even potentially endangering the Town and its residents.

24.     As a direct result of the staffing problems in the Department, Sullivan was frequently called upon to cover patrol shifts and respond to calls, which left him

with less time to complete the detective work that he had been hired to perform.

25. Sullivan was also required to work or be on call for an extraordinary number of hours, or even come in to work to cover calls when he was not on call. For example, it was not unheard of for Sullivan to be scheduled to work 7 am to 3 pm, have to work a few hours longer than scheduled due to a situation that arose during his shift, and then be on call overnight, before returning the following day for his regularly scheduled 7 am to 3 pm shift.

26. On or about September 10, 2019, Poirier authorized Sullivan to take home a police cruiser so that he could be more available to respond to Detective callouts and other events requiring the presence of a supervising officer.

27. In an adequately staffed police department, there would have been a rotating roster of senior staff to ensure that officers received needed time off; this did not exist at the BPD. Even when he was not on call, as one of the most senior officers, Sullivan was regularly called upon by other officers needing guidance.

28. Some of Sullivan's less urgent detective cases sat in his office, waiting for him to have the time and opportunity to complete reports; other less pressing or "cold" cases were waiting for him to have available time for further investigation.

29. The more time Sullivan spent on patrol shifts and responding to calls into the Department, the less time he had available for detective work, including on pending cases.

30. Poirer and the Town were aware that having Sullivan work patrol shifts made him less available to perform detective work and complete investigative reports.

31. It was Sullivan's regular practice to take the paper files for his pending

cases out of his filing cabinet in his office at the beginning of every shift he worked and stack them on his desk. He would return any files he was still working on to the cabinet at the end of each shift.

32.    Sullivan's open/pending case files, in addition to being visible to Poirier in IMC, were also apparent by simply looking at his desk each shift he worked.

33.    Poirier was often hypocritical: reprimanding officers for purportedly failing to follow Department rules and policies that he himself seldom adhered to.

34.    Poirier spent significant time and resources on community activities and he often required full participation in these activities from the other police officers in the Department who were already stretched too thin due to the staffing shortages.

35.    Upon information and belief, Poirier used these community activities to promote himself at the expense of the Department's other officers and at the expense of actual police work.

36.    Poirier let his personal political views infect the Department and insisted that Department resources, including personnel, be directed toward furthering political objectives.

37.    On July 6, 2020, with the assistance of Beijer who he refers to as his friend, Poirier contacted a member of then President Donald Trump's campaign staff in an attempt to have President Trump attend a "Community Cookout" event the Department would purportedly be holding the same day that the President was scheduled to be "just 35 miles from Barnstead" in Portsmouth, New Hampshire.

38.    Poirier expressed to the Trump representative his belief that the President was very supportive of law enforcement and noted that the Barnstead

community was also supportive, and not "defunding" police.

39.    Poirier signed off on his email to President Trump's staff member with the President's campaign slogan "Make America Great Again."

40.    Poirier was contacted by Trump's Northeast Regional Political Director, Eliss-Ann Voccola to arrange a "Make America Great Again Rally" which would also be attended by Trump surrogates/campaign operatives Pam Bondi and Lara Trump, the President's daughter-in-law.

41.    Poirier sent an email to all Department officers including Sullivan on July 17, 2020, with the subject "All hands on deck". Poirier advised the officers to "clear your calendars for Thursday, it is an ALL hands on deck at the PD and OT will be paid if you are not scheduled. Everyone should be polished and pressed…" The "Thursday" referenced by Poirier was July 23, 2020 – the day the Trump campaign visited BPD.

42.    Poirier required an already over-worked and short-staffed police department attend a political event and put on a show for his favored candidate and billed the cost of that event to the taxpayers of Barnstead.

43.    Upon information and belief, when one police officer conveyed that he did not want to attend the Trump event, Poirier advised him the consequence for his non-attendance would be the termination of his employment.

44.    In advance of the Trump campaign event, Poirier directed overworked officers to clean police cruisers inside and out, including shining the tires, so that the Trump campaign could use the police vehicles in staged photos. BPD officers were also required by Poirier to report early to the station for appearance inspections, including around haircuts and face shaving.

45.     Following the campaign event with BPD, on or about July 24, 2020, and as part of a pre-arranged campaign event to capitalize on the campaign's appearance in Barnstead with BPD, Poirier filmed an appearance for "Team Trump Online", an online campaign video appearance for which a "Surrogate Briefing Book" was prepared, identifying Poirier as a Trump surrogate. The briefing book included a script that followed the talking points "Joe Biden Would Defund the Police" and "The Biden-Bernie Unity Plan".

46.     Poirier wore his BPD uniform for his appearance on Team Trump Online and was on duty at the time of his appearance.

47.     Poirier also approved a quote to be used by the Trump campaign in a press release as follows:

> "The Left's praise and protection of the violent rioters wreaking havoc in or [sic] communities communicates a clear message: Joe Biden does not care about the safety of the American people," said **Paul Poirier, Chief of Barnstead Police Department.** "President Trump will always stand with law enforcement and understands police departments must be fully funded to protect citizens from harm's way." (Emphasis in the original).

48.     Multiple officers in the Department were upset about being required to attend the Trump campaign event.

49.     The BOS also received numerous complaints from citizens of the Town regarding the BPD's involvement in a campaign event.

**Sullivan Blows the Whistle on Poirier to the BOS, and**
**MRI is Engaged to Conduct an Independent Investigation**

50.    On or about August 13, 2020, Sullivan and Officer Jason Leavitt brought

their concerns regarding Poirier to Barnstead's Board of Selectmen ("BOS") in a non-

public session. Sullivan and Leavitt were advised that they were protected from

retaliation for speaking with the BOS and further, that if they experienced retaliation,

they needed to inform the BOS.

51.    At the August 13th BOS meeting, Beijer defended Poirier, asserting that

his email to officers "All hands on deck" and the threat to terminate the officer who said

he didn't want to attend the Trump event, did not mean that attendance was an Order

from their supervising officer. Per Beijer, that was only the "opinion" of Sullivan and

Officer Leavitt. When Sullivan continued to disagree with Beijer and noted that

Department employees had been instructed not to speak about the event outside of the

Department, she accused Sullivan of "threatening" her.

52.    Beijer complained that Sullivan and Officer Leavitt were "acting like a

union" and speaking for other people at the August 13th BOS meeting.

53.    Beijer also asserted that the Trump campaign event was about honoring

the female law enforcement officers, whereas Sullivan and Officer Leavitt, who were at

the event, confirmed that nothing had even been mentioned about the female officers.

54.    Sullivan and Leavitt relayed other concerns including Poirier's failure to

follow Department policies and procedures, his pattern of targeting of officers to drive

them out of the Department and retaliation for perceived disloyalty, all of which was

contributing to staff burnout and interfering with BPD's ability to operate.

55.    Throughout the August 13th meeting, the BOS repeatedly promised

10

Sullivan that he would not experience retaliation for bringing his concerns to the BOS.

56.     Upon information and belief, Beijer disclosed the substance of the August 13th meeting, as well as Sullivan and Officer Leavitt's identities, to Poirier.

57.     On or about August 14, 2020, Sullivan received a copy of a written report from a member of the Belknap County Sherrif's Department, Deputy Sheriff David Perkins (the "Perkins Report"), who had responded to Poirier's call for assistance at the scene of a shooting at a Dollar General the previous year.

58.     The Perkins Report contained Deputy Sheriff David Perkins' narrative of the events on the night of the shooting at Dollar General, which incident both Sullivan and Officer Leavitt had also responded to.

59.     The Perkins Report reflects observations including that Poirer had:

    a.  Been untruthful in presenting the situation to Deputy Sheriff Perkins while attempting to persuade him to activate a SWAT team;

    b.  Falsely claimed that individuals were under arrest when they were not and there was no basis to arrest them; and

    c.  Attempted to enlist the SWAT team in performing a search of a residence without a valid search warrant and where there was no reasonable or credible information that there were people inside who had committed a crime or presented a danger to the public.

60.     The Perkins Report also reflected that Poirer was yelling at a cooperative female subject and his breath smelled with the obvious order of an alcoholic beverage.

61.     As a police officer, Sullivan had an obligation to pass on information that

11

indicated that Poirier may have been under the influence of alcohol while working.

62.    On or about August 16, 2020, Sullivan and Officer Leavitt met with the BOS in a second non-public, emergency meeting.

63.    Beijer refused to attend the August 16th meeting.

64.    Upon information and belief, Beijer disclosed the time and place of the August 16th meeting to Barnstead residents who were her personal friends and known supporters of Poirier so that they could arrange to be present at the Town hall building and witness Sullivan and Officer Leavitt arriving to meet with the BOS. One of these people was Paula Penny, who was later elected to the BOS and was a voting member at the time of Sullivan's hearing pursuant to RSA 41-48.

65.    At the August 16th meeting, the BOS reviewed the Perkins Report. A motion was made to place Poirer on paid administrative leave and hire an independent investigator. The motion passed.

66.    On or about August 17, 2020, Poirer was placed on paid administrative leave pending the results of an independent investigation. Poirer took boxes from his office with him when he left the Department that day.

67.    Sullivan wass tasked with managing the day-to-day operations of the Department during Poirer's leave of absence.

68.    The Town engaged Municipal Resources Inc. ("MRI") on or about August 25, 2020, to conduct an independent investigation into the complaints brought forward by Sullivan, Leavitt, and some residents, and  to assess the state of the Department.

69.    In or about October 2020, MRI issued a forty-one (41) page report summarizing its findings (the "MRI Report").

70.     The MRI Report documents that the BOS received "numerous complaints from both residents and others" about Poirier and Barnstead PD hosting the Trump campaign event and expressing concern that doing so violated the Hatch Act, 5 U.S.C. § 7323 *et seq.*, and the state law equivalent NH R.S.A. § 659:44-a, which prohibits electioneering. Electioneering is defined by NH R.S.A. § 659:44-a as the use of government property and equipment by public employees, or while in the performance of his or her official duties, for the purpose of influencing the vote of a voter on any question or office.

71.     MRI determined that there was an overall level of discontent within the BPD that indicated the Department was dysfunctional.

72.     Numerous witnesses confirmed to MRI that the Department was consistently understaffed, and that the absence of adequate staffing contributed to high turnover and work not being completed in a timely manner.

73.     MRI found that Poirier violated PSTC Policy 301.05 (g) regarding background investigations by hiring an officer against the recommendation of the psychologist who evaluated the candidate on behalf of the Department.

74.     MRI recommended that the Town consult with PSTC regarding this violation by Poirier.

75.     With respect to the Trump campaign event that Poirier and the Department hosted, MRI made several findings:

a. Poirier's conduct created the impression that the BPD supported the reelection campaign of Trump and opposed Vice President Biden, and recommended that the Town consult with legal counsel

regarding whether Poirier's conduct violated the Hatch Act and/or NH R.S.A. § 659:44-a;

b. Poirer violated the Town's policy "Unacceptable Use of Town Email System"; and

c. Poirier violated Barnstead PD Policy# SOP 17-00019, IV, L related to engaging in political activities while on duty.

76.    In concluding the report, MRI stated that Poirier's management style, prerogative, and poor communication had contributed to a poor working environment and high turnover at the Department, and Poirier's lapses in judgment, as documented in the report, had undermined his credibility.

**Poirier is Reinstated and Immediately Begins to Retaliate Against Sullivan**

77.    While Poirer was on administrative leave Beijer was elected Chair of the BOS.

78.    On or about November 2, 2020, Poirier was reinstated as Chief by the BOS, subject to a one-year probationary period.

79.    During the probationary period, the Town required Poirer to:

a. Complete two (2) management classes approved by the BOS at his own expense.

b. Begin an accreditation program for the Department using the best practices and standards of the Commission on Accreditation for Law Enforcement Agencies, Inc. (CALEA).

c. Remove the posts related to the Trump campaign event from the Department's Facebook page and refrain from future similar posts

or activities (in his role as a Town official).

    d. Notify the BOS in advance regarding proposed uses of Town property, equipment, or employees outside the normal day-to-day operations of the Department.

80.    Despite numerous complaints of bullying and retaliation documented in the MRI Report, and despite assuring Sullivan and Officer Leavitt that they would not be retaliated against for speaking to the BOS, the Town did not require or even warn Poirer to refrain from retaliating against employees who made complaints or cooperated in the MRI investigation.

81.    The Town did not advise Sullivan, Leavitt, or the Department that Poirer was being permitted to return to work. Instead, on November 6, 2020, Poirier had dispatch summon BPD officers to the police station while they were on duty where Poirier and Beijer were waiting to confront them. When Sullivan and Officer Leavitt arrived at the police station, an openly hostile Poirier demanded the return of his weapon, swipe card and keys. Beijer openly expressed her anger at Sullivan for Poirier's suspension.

82.    The failure to notify Officer Leavitt of Poirer's return from leave is particularly significant as he was the Officer in charge of the Department's armory, which includes firearms issued to all officers, and the last communication from the BOS to the Department was on August 27, 2020 stating that there was to be no communication between Department members and Poirer.

83.    Immediately after he returned to duty, Poirier began to retaliate against Sullivan. This retaliation took the form of an ongoing campaign of targeted harassment

that included diminution of responsibilities, micro-managing, false accusations, and disparate treatment.

84.     Poirier took away Sullivan's responsibility for preparing the schedule for BPD officers. Sullivan had been handling the schedule for several years at the time that Poirier relieved him of this responsibility.

85.     Poirier began to scrutinize Sullivan's case files in and after November 2020. Prior to November 2020, Poirier did not have a regular practice of overseeing Sullivan's caseload and Poirier did not approve Sullivan's case reports in IMC.

86.     On or about November 9, 2020, Sullivan was dispatched to respond to a burglar alarm while Poirier was the other officer on duty. Contrary to policing best practices and the usual procedures of BPD, and despite being available to do so, Poirier did not provide back-up for Sullivan in responding to this call. When another officer responded to a burglar alarm at the same address on or about the next day, Poirier did respond to provide back up to that officer.

87.     After his return from leave, Poirier revoked his authorization for Sullivan to take a police vehicle home, thereby requiring him to use his personal vehicle or report to BPD first before responding to a call when responding to calls from his home when not on duty.

88.     On or about November 10, 2020, Poirier accused Sullivan of losing a gas card for a BPD cruiser.

89.     Despite knowing that Sullivan was already stretched too thin as a detective being asked to take on regular patrol responsibilities, Poirier added the requirement that Sullivan submit Daily Activity Logs to account for all of his time.

90.     Poirier then complained that Sullivan's Daily Activity Logs did not provide sufficient detail about his work on cases. Upon information and belief, Poirier had directed other officers to include less detail on their Daily Activity Logs.

91.     Poirier took steps to interfere with Sullivan's ability to complete his detective work such as assigning him to lengthy transport errands for cases he was not managing, but which took him away from work on his existing cases, refusing to allow him access to video recordings of interviews he had conducted to facilitate writing his reports, and instructing him not to take time in the office and instead spend his time out on patrol.

92.     Poirier removed Sullivan as the Field Training Officer ("FTO), something that Sullivan had been hired to manage, and designated Sergeant Ryan to oversee the program instead, even though Sgt. Ryan lacked the requisite experience for this position.

93.     Poirier revoked Sullivan's administrative rights in BPD computer systems. Administrative rights were necessary for Sullivan to complete his assigned work.

**Beijer and Poirier Conspire to Have MRI Investigate Sullivan**

94.     On or about November 10, 2020, Poirier disclosed at a BOS meeting that the MRI Report and other items related to the investigation had been shared with him and with his attorney.

95.     Sullivan, who had already requested the MRI report and related documents on or prior to November 10, 2020, requested them again on November 13, 2020, noting that Poirier had already been provided with copies.

96.     Karen Montgomery ("Montgomery"), the Town Administrator, informed Sullivan that he would have to wait for the MRI Report to be redacted before he could see it. As of this Complaint, the unredacted MRI Report has still not been made available to Sullivan.

97.     Upon information and belief, Poirier was provided with an unredacted copy of the MRI Report giving him complete access to the identity of every person who cooperated in the MRI investigation and the substance of their interviews with MRI.

98.     In a non-public session of the November 10, 2020 BOS meeting, the BOS voted to ask MRI to address some additional questions.

99.     On December 1, 2020, Poirier went before the BOS to complain about the MRI investigation. Poirer states that he has read the whole investigation report and the BOS minutes and he has begun to put everything together. Poirier tells the BOS that he has done "nothing wrong" but there is a "cloud hanging over his head" and this is "because of two people."

100.    Upon information and belief, the "two people" Poirier was referring to were Sullivan and Leavitt.

101.    On or about December 3, 2020, Beijer communicated with MRI and in doing so, claimed to be acting as a member of the BOS.

102.    Beijer instructed MRI to investigate additional questions and provided MRI with the minutes from the November 10, 2020 BOS non-public meeting purporting to authorize these additional questions.

103.    Upon information and belief, Beijer directed MRI to investigate three different or additional questions than the questions that the BOS approved for further

investigation by MRI.

104.    One of these different/additional questions was an allegation made by Beijer that Sullivan had threatened her during the non-public August 13, 2020 BOS meeting with Sullivan and Leavitt.

105.    Upon information and belief, Beijer and Poirier were working together to retaliate against Sullivan and to devise these additional questions for MRI.

106.    Upon information and belief, Beijer's purpose in deliberately misrepresenting the questions approved by the BOS for additional inquiry was, in whole or in part, to aid Poirier in his effort to harm and/or retaliate against Sullivan.

107.    Upon information and belief, Beijer knowingly misrepresented to MRI the inquiry authorized by the BOS in an effort to aid Poirier in harming Sullivan.

108.    In his MRI interview, Poirier that he had turned over keys to his office filing cabinet when placed on leave, and upon his return discovered that his personal thumb drive and a paper file purportedly containing Poirier's outstanding investigative reports and information on personnel issues and other confidential matters, including Sullivan's personnel materials and background investigation.

109.    Upon information and belief, Poirier's use of a thumb drive and loose personal paper files to maintain this confidential information was a violation of both Town and BPD policies.

110.    Poirier showed MRI video footage of a BPD member entering and exiting his office during his leave, at times with papers, and claimed to possess an additional video that he did not share with MRI that demonstrated the same BPD member receiving keys to the locked filing cabinet in Poirer's office, but did not present this

video to MRI. The name of the BPD member Poirer was accusing was redacted in the MRI report.

111.    Upon information and belief, the officer Poirer accused of taking the keys to his filing cabinet is Sullivan.

112.    Poirier also informed MRI that he felt there may be "Laurie issues" with two officers on the BPD. Those names were also redacted in the report.

113.    "Laurie issues" refers to the "Laurie list" or the Exculpatory Evidence Schedule ("EES"), the list of police officers that have been deemed by the head of his/her law enforcement agency as having potentially exculpatory evidence in their personnel file relevant to a criminal prosecution (usually information reflecting on the officer's honesty or credibility as a witness).

114.    When MRI asked Poirier to identify the potential "Laurie issues" he said that he "wasn't sure" and "he would have to review [MRI's] report again to determine what they were."

115.    Upon information and belief, the two officers Poirier identified as potentially needing to be placed on the EES were Sullivan and Officer Leavitt.

116.    As the Chief of BPD, Poirier alone had the authority to designate Sullivan for placement on the EES.

117.    New Hampshire law requires that an officer be provided with written notice of their placement on the EES and the opportunity to formally dispute such placement and the underlying allegations before an officer's placement on the EES can be publicly disclosed.

118.    Upon information and belief, Poirier knew that there was no legitimate

basis for placing Sullivan on the EES when he made this assertion to MRI.

119.    On or around December 22, 2020, the BOS discovered that Beijer had directed MRI to investigate questions outside the scope of those it had authorized, and the BOS voted to immediately terminate the second investigation.

120.    The BOS requested that MRI memorialize its findings to date in writing, and it issued a second report in December 2020 (the "MRI Follow Up").

121.    Nearly every word of Beijer's interview reported in the MRI Follow Up has been redacted and Sullivan has not been permitted to see what she reported to MRI.

**Poirier Continues to Retaliate Against and Harass**
**Sullivan While the BOS Condones His Unlawful Behavior**

122.    Poirier was aware that Sullivan suffered from severe pain in his back, hips and legs caused by wearing his duty belt. This condition was exacerbated by additional hours spent on patrol in lieu of performing detective work.

123.    In December 2020, Sullivan provided Poirier with a letter from his treating physician regarding the need for an accommodation with respect to the duty belt and Poirier ignored Sullivan's request.

124.    Sullivan was forced to contact the Town directly to seek relief. The Town did not remedy Sullivan's need for accommodation, nor did it address Poirier ignoring Sullivan's request.

125.    In or around late December 2020, Sullivan requested a meeting with Ms. Montgomery and the BOS to discuss the many instances of targeting, harassment and retaliation he was experiencing from Poirier that were creating a hostile work environment. The BOS did not respond to Sullivan's request for a meeting in December

2020.

126.    Police officers, including Sullivan, are required by New Hampshire law to complete physical fitness testing every three years (RSA 106-L:6). Sullivan's physical fitness testing was required to be completed by December 31, 2020.

127.    On December 21, 2020, Poirier sent Sullivan and email message ordering him to report to PSTC for his fitness testing on December 28, 2020.

128.    After scheduling Sullivan's test at PSTC, Poirier inexplicably changed course and tried to hijack Sullivan's three-year physical fitness test by forcing Sullivan to test with BPD police officer Sargeant Ryan who was known to be loyal to Poirier.

129.    Upon information and belief, Poirier wanted Sargeant Ryan to conduct Sullivan's physical fitness test because Poirier was seeking to control the outcome of the test and sabotage Sullivan.

130.    Sullivan did not trust that Sargeant Ryan would accurately report the results of his physical fitness test and refused to move his test away from PSTC.

131.    On December 23, 2020, the day after the BOS terminated the second MRI investigation due to the discovery that Beijer had gone rogue and authorized an inquiry inconsistent with what the BOS approved, Poirier saw Sullivan pulled over on the side of the road talking with BOS Vice-Chairman Rick Therrien. In front of Vice-Therrien, Poirier threatened Sullivan with suspension if he refused to acquiesce to the demand to take the fitness test with Sargeant Ryan and Poirier instead of PSTC.

132.    Poirier was visibly irate that Sullivan refused to give up his previously scheduled physical appointment with the PSTC. Later that day, when Sullivan and Poirier had both returned to the police station, Poirier became physically aggressive in

22

confronting Sullivan, yelling in his face and attempting to provoke him. When Poirier's efforts failed, he dismissed Sullivan for the remainder of that day.

133.    On December 26, 2020, Poirier issued a written "Violation of Department Policies" notice to Sullivan that recommended he be suspended without pay. Sullivan was charged by Poirier with conduct unbecoming an officer, being discourteous, and insubordination for Sullivan's conversation with Vice-Chairman Therrien and his refusal, in front of Therrien, to acquiesce to Poirier's demand that he change his scheduled fitness exam to one with Poirier and his known ally, Sergeant Ryan.

134.    Poirier recommended that Sullivan be suspended without pay in the December 26, 2020 Violation claiming it was a "Class 3" violation (severe enough to warrant termination or reduction in rank), but then curiously noted that he was "placing this letter of reprimand remain in [Sullivan's] personal file and not seeking any further action." [sic]

135.    On Sunday, December 27, 2020, Poirier contacted Director John Scippa at PSTC and attempted to sabotage Sullivan's fitness test, calling into question "[his] intentions on reporting to the Academy" for his fitness test the next day, December 28, 2020, and suggesting that Sullivan's testing, which Poirier himself had scheduled in the first instance, caused him to reschedule other obligations to ensure there was adequate police coverage for the community.

136.    In his December 27, 2020, message to Director Scippa, Poirier stated that he had "relieved [Sullivan] of his duties" due to conduct he characterized as "flagrant insubordination."

137.    Director Scippa replied to Poirier on December 27, 2020, including Major

David Parenteau, the Law Enforcement Training Specialist at PSTC overseeing officer

fitness tests on his email. Both Director Scippa and Major Parenteau informed Poirier

that if Sullivan was presently on a disciplinary suspension, Sullivan would not be

eligible to take the fitness test.

138.    Upon information and belief, Poirier was aware that Sullivan was

seeking to report his unlawful and retaliatory treatment of Sullivan to the BOS when

he issued the Violation and when he contacted Director Scippa.

139.    Upon information and belief, Poirier was retaliating against Sullivan for

reporting his prior conduct to the BOS and for his ongoing communication with BOS

members, including the conversation Poirier witnessed with Selectman Therrien, by

attempting to sabotage his fitness test which, if successful, would have ended Sullivan's

employment.

140.    On or about January 6, 2021, Sullivan reiterated his request for a

meeting with the BOS to report Poirier's retaliatory targeting of him. That meeting

took place in a non-public session of the BOS held on January 12, 2021.

141.    The BOS took no steps to remedy the retaliation Sullivan had already

experienced as reported to them at the January 12, 2021 meeting, or to protect him

from further retaliation from Poirier.

142.    As a direct result of the BOS's inaction, Poirier was emboldened and his

retaliation against Sullivan intensified.

143.    In or around January 2021, Sullivan was reassigned to work the night

shift as a patrol officer, from approximately 11:00 p.m. to 7:00 a.m. This change left

Sullivan with virtually no time to conduct necessary detective work including witness

interviews.

144.    Poirier required Sullivan to spend his time on the night shift on patrol, driving the streets of Barnstead, ensuring that he was unavailable for any detective work.

145.    In January 2021, Poirier required Sullivan to begin using the "old Charger" as the Department's 2013 Dodge Charger was referred to, which had known mechanical issues and as a rear-wheel drive vehicle, was known to be unsafe in snow and icy road conditions. When Sullivan used another vehicle, Poirier required Sullivan to write a memo explaining his purported failure to follow a direct order. Sullivan wrote the memo, citing the hazardous conditions on the road and recent experiences of officers becoming stuck when using the vehicle.

146.    Poirier continued to demand that Sullivan use the 2013 Charger "unless it is snowing or inoperable", conceding that it was unsafe in winter weather conditions.

147.    On or around January 12, 2021, Sullivan met with the BOS again to report Poirier's ongoing harassment and retaliation.

148.    Upon information and belief, the BOS took no steps to remedy the retaliation Sullivan had already suffered due to Poirier's actions, or to protect him from further harassment and retaliation by Poirier.

149.    At the meeting with the BOS on January 12, 2021, Sullivan requested copies of his personnel records and other records related to his employment, including those in Poirier's possession.

150.    After Sullivan's meeting with the BOS, Poirier ordered Sullivan via e-mail to stop contacting the BOS and the Town Administrator, stating that Sullivan was

required to bring any questions or concerns he had to Poirier first.

151.     On or around January 26, 2021, Poirier finally acknowledged Sullivan's request for accommodation related to his back condition and claimed that he would authorize the issuance of a carrier vest to Sullivan, as Sullivan's doctor recommended, as an accommodation, but wanted Sullivan to meet with him without a witness from the BOS or the Town Administrator present.

152.     On or about February 13, 2021, Sullivan wrote to the BOS via e-mail reiterating his request for personnel records including files in Poirier's possession because he had received no response from them and did not trust that Poirier would not surreptitiously add damaging information to his file in an attempt to build a case to terminate his employment.

153.     The BOS failed to respond to Sullivan's February 13, 2021 letter. Instead, Poirier again wrote to Sullivan trying to cut off his line of communication with the BOS,  "I am also reminding you again per my previous order that any communication with the town Administrator Karen Montgomery or any board of selectmen member must go through me…"

154.     On or about February 16, 2021 Sullivan emailed the BOS indicating that because Poirier's harassment and retaliation was ongoing, he would no longer communicate with Poirier without including a BOS member or the Town Administrators as a witness or in writing to avoid unmonitored communication with Poirier. Neither the BOS nor the Town Administrator intervened to protect Sullivan from Poirier's retaliation.

155.     Sullivan also sought assistance from the New Hampshire Department of

Labor on or around February 16, 2021, filing a complaint pursuant to the Whistleblower's Protection Act for "ongoing" retaliation by Poirier (the "Whistleblower's Complaint"). The Whistleblower's Complaint was sent to Barnstead on or around February 19, 2021.

156.    On February 27, 2021, Sullivan reached out to the BOS again, regarding the ongoing retaliation from Poirier, requesting that they notify Poirier that he should not be in Sullivan's presence or have communications with him unless members of the BOS were there as witnesses or were copied on the communication. Sullivan noted that Barnstead's ongoing failure to protect him as a whistleblower had allowed Poirier's behaviors to continue and led to this result. Once again, the BOS took no steps to protect Sullivan from Poirier.

157.    On February 28, 2021, outgoing BOS member Lori Mahar sent an electronic mail message to Sullivan, Poirier, Beijer, and the remaining BOS members noting that her term on the BOS had nearly concluded but that she wanted it to "be on record" that she had expressed to the BOS that Sullivan's "concerns seem valid and WE, as a board, have a responsibility to find a resolution to this concern." The BOS did not act to address Sullivan's concerns and stop Poirier's unlawful retaliation.

158.    On or around March 2, 2021, the BOS sent Sullivan a letter acknowledging his complaints of retaliation by Poirier, but essentially refusing to address them, telling Sullivan that the BOS was "not going to sit as a finder of fact" in the disputes between Sullivan and Poirier, and stating that Poirier had authority, pursuant to RSA 105:2-a to direct and control all employees of his department in their normal course of duty, and informing Sullivan that he "need[ed] to work directly with

the Chief on a day-to-day basis."

159.    On or around March 9, 2021, Barnstead sought dismissal of the

Whistleblower Complaint arguing that Sullivan had not been subject to any adverse

action by the BOS or Poirier.

160.    Sullivan ultimately withdrew his Whistleblower Complaint on April 26,

2021, without prejudice due to the ongoing retaliation he was experiencing from the

Defendants.

**Poirier Recommends Sullivan's Termination and a Sham**
**Hearing is Held Before the Board of Selectman**

161.    Instead of protecting Sullivan from Poirier's retaliation, on March 30,

2021, the BOS notified Sullivan via letter (hereinafter the "Termination

Recommendation") that Poirier had recommended that his employment with BPD be

terminated immediately for "insubordination and dereliction of duties" and that he

would be "suspended without pay until further decision of the Board following the

hearing" he was entitled to pursuant to RSA 41:48.

162.    The Termination Notice identified the following allegations to be

addressed at the hearing on his proposed termination:

a. Failure to report to duty

b. Failure to call out prior to shift

c. Failure to produce a doctor's note stating you cannot work

d. Failure to undertake and complete investigations

e. Failure to produce appropriate paperwork

f. Refusal to follow orders

g. Refusal to communicate with the Chief

h. Refusal to communicate with department employees.

163.    On May 18, 2021, a hearing was held before the BOS on the Termination Recommendation (the "May 18th Hearing").

164.    The Hearings were held in public, and were video recorded and live streamed for people to watch from other locations.

165.    At the May 18th Hearing, and after allowing Poirier to present the evidence he wanted to present without limitation, Beijer imposed limitations on the time Sullivan would have to present his case.

166.    On June 1, 2021, a second (continued) night of hearing was held before the BOS on Sullivan's Notice of Termination (the "June 1st Hearing" and collectively, with the May 18th Hearing, the "Hearing").

167.    Poirier presented "evidence" at the Hearing which essentially consisted of approximately fifty written reprimands (including subparts) documenting purported violations of BPD Rules and Regulations.[1] Poirier was sworn in before his testimony began and all of his statements at the Hearing were made under oath.

168.    The first of these violations are dated February 25, 2021 and pertain to alleged violations committed by Sullivan nine months earlier, in May 2020. Poirier charged Sullivan with Insubordination, Neglect of Duty, and violation of the Department's evidence policies.

169.    Poirier also issued a written reprimand to Sullivan dated February 25, 2021 for failing to drive the 2013 Dodge Charger as ordered, which Poirier deemed Insubordination.

---

[1] Because many of the violations Sullivan was provided with appear to either contain subparts or appear duplicative, Sullivan is unable to ascertain the exact number, but estimates they are around fifty (50) total.

170.    Even though the February 25, 2021 written reprimands are dated before he was placed on leave and Sullivan had requested this information multiple times and as recently as his February 13, 2021 letter, Sullivan was not notified that Poirier had issued these reprimands or provided an opportunity to respond to them, before they were placed in his personnel file.

171.    On April 9, 2021, *after* Sullivan was notified of Poirier's Termination Recommendation and placed on unpaid leave, Poirier issued more than thirty (30) additional written reprimands to Sullivan. More than half of these purported violations were for investigative reports, which Poirier deemed "late" and, therefore, a violation of BPD Rules and Regulations and "Neglect of Duty".

172.    The written reprimands for late reports/neglect of duty issued on April 9, 2021 involved cases or incidents that were up to two years old.

173.    These written reprimands themselves, although purporting to be a disciplinary action, violated the terms of the BPD's discipline policy. (BPD SOP# 17-00022 – Discipline).

174.    The majority of the written reprimands for late reports/neglect of duty issued on April 9, 2021 were for cases where Sullivan had completed the report prior to Poirier issuing the reprimand, a fact Poirier was aware of, but for which Poirier still issued a reprimand.

175.    Poirier did not seek to reprimand Sullivan for these "late" reports until after Sullivan complained to the BOS and filed a Whistleblower Complaint with the Department of Labor.

176.    On or about March 12 2021, Sullivan had been briefly placed on

30

restricted duty and unable to patrol due to his medical condition (back injury). During that time period, when Poirier was unable to force Sullivan to spend his time driving the streets of Barnstead or otherwise covering for the shortage in police officers, Sullivan was finally able to complete a significant amount of his outstanding detective work, including reports.

177.    Poirier also issued a written reprimand to Sullivan on April 9, 2021 asserting that Sullivan had failed to meet the required conduct of "Truthfulness" when he responded to a County Attorney's inquiry on a case by telling her that the BPD did not have a shotgun in its possession. Sullivan was censured for "Conduct Unbecoming an Officer", even though he relied on the Department's evidence log and report pictures, neither of which reflected a shotgun, and the word of the Department's two evidence officers.

178.    "Truthfulness" is defined in BPD Rules and Regulations as "Members will speak the truth at all times and under all circumstances. Members will not knowingly make false reports, or enter or cause to be entered any false or improper information into any report or department document."

179.    Per Poirier, Sullivan should have also searched the evidence room and questioned the Department's evidence officers (which he did do).

180.    Because Poirier and Sergeant Ryan mysteriously found the shotgun that was never entered into evidence as required, Poirier deemed Sullivan, who had nothing to do with the case, dishonest.

181.    Upon information and belief, Poirier did not issue written reprimands to the officer(s) who failed to properly log the shotgun into evidence or document its

existence in the case report and photographs.

182.    Poirier issued two additional (2) written reprimands for placement in Sullivan's personnel file on May 3, 2021. Just as he did with the previous reprimands, Poirier did not notify Sullivan of these disciplinary actions.

183.    The May 3, 2021 written reprimands both disciplined Sullivan for his communications with the Town Administrator and the BOS reporting Poirier's retaliation as described in this Complaint.

184.    One May 3, 2021 reprimand, specifically identified Sullivan's communications with the Town Administrator and BOS on February 12, 2021, February 27, 2021, and March 12, 2021. The same reprimand also sought to punish Sullivan for seeking protection from being in Poirier's presence or having to communicate with him directly, without a Town official as a witness.

185.    Poirier deemed Sullivan's attempts to insulate himself from further harassment and retaliation by ensuring that a witness was present who was not dependent on Poirier for their livelihood "flagrant insubordination" and wrote that "[t]his behavior will not be tolerated within the Barnstead Police Department."

186.    The other May 3, 2021 written reprimand issued by Poirier was also for Insubordination and it was due to Sullivan's continued practice of protecting himself from Poirier's retaliation by creating a written record by using e-mail for notification when he needed to call out of work due to illness.

187.    Apparently dissatisfied with the approximately fifty (50) written reprimands he had belatedly generated to justify Sullivan's termination, Poirier issued yet another written reprimand to Sullivan after the May 18th Hearing, for his

32

statements to the BOS reporting Poirier's conduct on August 13, 2020 and August 16, 2020.

188.    Most of the so-called "late" reports for which Sullivan received written reprimands were completed between March 12, 2021 and March 14, 2021 when Sullivan was assigned to restricted duty due to his back injury.

189.    Poirier testified that he believed Sullivan had completed the reports between March 12, 2021 and March 14, 2021 because a BOS member had tipped Sullivan off that Poirier was intending to discipline Sullivan.

190.    Thus, per Poirier's own testimony, he had already communicated with the BOS prior to March 12, 2021 about a plan to create written reprimands to support the Termination Recommendation.

191.    Poirier repeatedly testified that he conducted daily staff meetings to review outstanding cases at the BPD. Despite this, Poirier never acted to discipline Sullivan for failing to complete outstanding reports until April 9, 2021[2] when he needed to compile "evidence" to support his recommendation that Sullivan's employment be terminated.

192.    Prior to Sullivan and Leavitt's complaints about Poirier to the BOS, Sullivan had never been issued a written reprimand by BPD.

193.    In fact, on July 11, 2020, Sullivan received a Commendation and Exemplary Service Unit Award in connection with an incident that took place on August 12, 2019 (the Dollar General incident, described above), but Poirier later reversed course and issued a written reprimand in connection with that same incident

---

[2] Sullivan's termination hearing pursuant to RSA 41:48 was originally scheduled for April 12, 2021.

on June 8, 2021.

194.     The June 8, 2021 written reprimand was based on Sullivan's statements to the BOS when he and Leavitt brought forward their complaints about Poirier in non-public meetings held on August 13, 2020 and August 16, 2020. The BOS voted to unseal the minutes from those August 2020 meetings during the May 18th Hearing.

195.     Despite the BOS promise to Officers Sullivan and Leavitt that they would not be retaliated against for bringing their concerns to the BOS' attention, Poirier issued a lengthy written reprimand quoting extensively from the meeting minutes, declaring Sullivan "dishonest" and "not trustworthy" with credibility issues that "undoubtedly has no place in the profession of law enforcement and could be cause for Sgt. Jim Sullivan to be placed on the Exculpatory Evidence Schedule (EES) moving forward."

196.     Poirier determined that Sullivan had failed to exhibit the required conduct of "truthfulness" and found he had committed "Conduct Unbecoming an Officer". Finally, the written reprimand didn't identify a punishment for this purported rule violation; instead it simply promised that "further action" would follow.

197.     Further action followed when Sullivan's employment was suspended and then terminated in retaliation for his reports to the BOS about Poirier.

**Poirier Recklessly and Maliciously Damages Sullivan's Reputation**

198.     On March 31, 2021, Captain Cormier of the BPD caused a Status Notification Form "B" to be filed with the PTSC notifying them that Sullivan had been placed on suspension for 10 days.

199.     On April 16, 2021, Poirer caused a second Status Notification Form "B"

to be filed with the PTSC. Instead of simply extending the number of days indicating the length of Sullivan's suspension, Poirier went out of his way to check "Other" and then added "Suspended/Active Criminal Investigation".

200.   Poirier knew when he completed the Status Notification Form "B" on April 16, 2021, that the BOS decision to suspend Sullivan was unrelated to any "Active Criminal Investigation" and was actually brought about by his Termination Recommendation for insubordination and dereliction of duties, which makes no mention of criminal conduct or investigation.

201.   When Poirier filed the second Status Notification Form on April 16, 2021, he was aware that the false information of "Active Criminal Investigation" in the Form would harm Sullivan's reputation.

202.   Upon information and belief, Poirier intentionally misrepresented the reason for Sullivan's suspension to the PTSC for the purpose of harming Sullivan.

203.   In or around February 2022, the Union Leader reported the information from PTSC, identifying police officers in 2021 who had "work-related issues". Sullivan was identified by name twice: for the suspension and for his discharge.

204.   Poirier then re-published this information on the BPD Facebook page, ensuring that citizens of Barnstead would see Sullivan's name on this list, with the caption "Transparency in law enforcement is key and it's critical."

205.   Throughout the Hearing, Poirier made numerous outrageous and unsupported accusations against Sullivan.

206.   Poirier blamed Sullivan for failing to prevent the murder of a young mother in a domestic violence incident in a different state, even though there was no

35

evidence of domestic violence occurring in New Hampshire and DCYF had signed off on the home environment and custodial parent as safe.

207.     Poirier stated at the public Hearing that he believed Sullivan should be placed on the EES.

208.     Poirier knew when he made this statement that placement on the EES is very damaging to a police detective's career because the reliability of their testimony is called into question for all cases they work on.

209.     Poirier is the person who had authority to refer Sullivan for placement on the EES. Despite his authority to do so, Poirier never referred Sullivan for placement on the EES.

210.     Upon information and belief, Poirier did not refer Sullivan for placement on the EES because he knew that any effort to do so would ultimately not be successful because such a referral would trigger notice to Sullivan and an opportunity for him to challenge the information provided by Poirier.

211.     Upon information and belief, Poirier sought to damage Sullivan's reputation by publicly stating that he should be placed on the EES when he knew he had not exercised his authority to make that referral.

212.     Poirier stated at the public Hearing that Sullivan was being investigated for criminal activity, but refused to provide Sullivan with any specific information including the nature of the charges, who had referred the matter for criminal investigation, or to what agency the matter had been referred.

213.     As a result of these non-specific and unknown criminal charges, Sullivan, on the advice of legal counsel, was not able to provide testimony at the Hearing.

214.    Poirier stated that Sullivan had failed to investigate and properly secure evidence in a homicide case when Poirier knew that the case had already been ruled an accidental death by the state medical examiner, not a homicide.

215.    Poirier falsely stated that it was procedure to take fingerprints and treat every overdose incident like a crime scene and that Sullivan had failed to do this, when Poirier knew or should have known that this was not standard police protocol.

**The Hearing Was Infected with Bias**

216.    Multiple members of the BOS made their positions with respect to Sullivan clear:

> a.  Beijer's friendship with Poirier and allegiance to him were known from the outset. She openly supported his involvement in the Trump event, making the connection that allowed that event to take place. In fact, Beijer had refused to attend the August 16, 2020 non-public session with Sullivan and Officer Leavitt, which Sullivan requested to present additional information that the BOS asked him to obtain.
>
> b.  Beijer was openly hostile to Sullivan from the outset. When Poirier was reinstated, Beijer told Sullivan she was very angry with him over Poirier's suspension.
>
> c.  Beijer accused Sullivan of threatening her in a non-public session of the BOS, and then repeated this accusation at the beginning of the Hearing.
>
> d.  Despite the very personal accusations she made about Sullivan,

Beijer refused to recuse herself from evaluating Sullivan's employment.

e.  BOS Member Tasker stated on the record at the Hearing that he was "tired of listening to [the Hearing]" and he didn't believe anything they'd heard would change their opinion.

f.  Member Tasker stated that he didn't understand why "[Sullivan] can't say why he won't go back to work", which proved he had in fact stopped listening because nobody had said that Sullivan refused to go back to work, and wanted to limit the next hearing date because of this.

g.  BOS Member Penny was an open supporter of Poirier, and had written an email to the BOS while he was being investigated declaring that the Town and the BPD "need the leadership of our chief" and that it would be "in the best interest" of the Town to reinstate Poirier. Penny reached this conclusion before the MRI Report had been completed and released and there is no evidence that she was open to changing her opinion based on the results of that investigation.

217.    The BOS voted on June 1, 2020 to limit Sullivan's counsel to only one (1) more hour of hearing time, claiming she already had three hours. In fact, Sullivan's counsel had two and one-half hours on the previous hearing date.

218.    Sullivan was presented with approximately fifty (50) written reprimands, including a new, seven (7) page written reprimand supported by thirty (30) pages of

attachments dated June 8, 2021, between the first and second hearing dates.

219.    There were nearly three hundred (300) total pages of written reprimands and attachments purportedly justifying Sullivan's termination, plus a criminal accusation that was undisclosed and not noticed, and an allegation of failure to attend mediation that was undisclosed and not noticed, yet the BOS limited Sullivan's counsel to three and one-half hours (3.5) total of hearing time to address all of these allegations.

220.    Beijer ran interference for Poirier at the Hearing, inappropriately interjecting herself into the case after she refused to recuse herself despite her obvious bias.

221.    Beijer then served as accuser, "evidence" presenter, unsworn witness, and jury at the Hearing. Beijer asked Sullivan questions about letters and e-mails, then inaccurately characterized their contents, before basing her termination vote on conclusory statements regarding those mischaracterized contents.

222.    Sullivan was presented with a Garrity Warning at the Hearing but refused to sign it on the advice of counsel, relying on his 5th Amendment right to refrain from incriminating himself and the BOS and Poirier's refusal to identify the nature of the criminal investigation that he was already apparently the subject of.

223.    A hearing pursuant to RSA 41:48 is for the sole purpose of establishing good cause to terminate a police officer. In this case, the BOS made sure Sullivan knew there was an unknown to him threat of criminal prosecution and then tried to turn his failure to answer questions at the Hearing, which was not a law enforcement internal investigation, into an independent ground for termination.

224.    The BOS did not provide Sullivan with authorization from the New

Hampshire Attorney General's office or the Belknap County Attorney's office granting

Sullivan immunity for his statements as would have been proper procedure, nor did

they provide any assurances that the questions they would be asking were wholly

unrelated to the pending criminal accusations.

**The BOS Votes to Terminate Sullivan's Employment
for Different Reasons Than Those Listed in the
Termination Notice**

225.    On June 22, 2021, at a public hearing, the BOS voted to terminate

Sullivan's employment.

226.    BOS Member Beijer claimed that Sullivan provided written notification

that he would not work with Poirer anymore, that Sullivan had refused to attend

mediation that was mandated by the BOS, and that he had refused to answer BOS

questions at the Hearing, and for those reasons she was in favor of terminating

Sullivan's employment.

227.    Beijer, who was present as a fact-finder, not as a witness, and was not

sworn in or made available for Sullivan to cross-examine, is the only person who

pretended to present "evidence" about the mediation, but even that was simply a

writing directing Sullivan to attend mediation, not evidence that he failed to appear as

directed.

228.    BOS Member Penny said the information at the Hearing revealed that

Sullivan did not want to return to work, did not want to participate in mediation, and

did not want to answer questions regarding these issues. Member Penny said she

supported Sullivan's termination for those reasons.

229.    BOS Member Therrien said that he was disappointed that things with

Sullivan could not have been handled internally and with the way the Hearing went and with the answers he got/was not able to obtain answers to the questions that are bothering him.

230.    BOS Member Tasker stated that he would reiterate some of what Therrien and Penny said, and added that he takes it as a personal affront when an employee tries to dictate how the BOS is run.

231.    BOS Member Madden says that he was disappointed that the BOS's questions to Sullivan could not be answered and without those answers and Sullivan refusing the BOS' orders, it was disappointing and not how he wishes things were done.

232.    BOS Member Penny made a motion to terminate the employment of Sergeant Sullivan after each BOS member spoke at the June 22, 2021 Hearing.

233.    Chairwoman Beijer announced before the vote "to be clear, the specific reasons for termination were written notification from Sergeant Sullivan that he would not work with the chief or anyone in the department, his refusal to attend mediation that was mandated by the Board, and his refusal to answer questions by the Board at the hearing." Per Beijer, each offense was itself grounds for termination.

234.    The Board voted 4-1 to terminate Sullivan's employment as follows: Beijer, yes; Therrien, no; Madden, yes; Penny, yes; Tasker, yes.

235.    Notably, the BOS did not vote on the items listed in the Termination Recommendation, so there was never any finding that the evidence presented was sufficient to prove those allegations.

**No Evidence Was Presented at the Hearing Regarding**
**Mediation and Sullivan Was Never Provided Notice**
**That This Would be a Factor in his Termination.**

236.    On March 5, 2021 the BOS wrote to Sullivan that they had voted to "require [him] to participate in mediation through an outside agency" to resolve Sullivan's request for accommodation in the form of an outside carrier vest as an alternative to a duty belt.

237.    Mediation was scheduled to take place on March 19, 2021, with Attorney Melinda Gehris.

238.    The issue of mediation and whether or not Sullivan had participated as directed was not included as a reason for termination in the March 30, 2021, letter from the BOS, nor was Sullivan ever disciplined in connection with this.

239.    The only witness at the Hearing was Poirier. Poirier did not present any evidence or even discuss the mediation issue.

240.    Without regard for the absence of any evidence presented by a sworn witness, Beijer, the BOS Chair, claimed that Sullivan had refused to attend mediation and cited this refusal as a leading cause for her vote to terminate his employment.

241.    Beijer was present at the Hearing in a fact-finding role; she was not sworn in as a witness or made available to Sullivan for cross-examination.

242.    Other BOS members appeared to accept Beijer's assertions that Sullivan had refused to attend mediation as factually accurate, without regard for the absence of any credible evidence supporting this claim, and then they, too, adopted it as justification for terminating Sullivan's employment.

243.    Melinda Gehris reports that she was not engaged by Barnstead as a

mediator. Rather, she says she was hired by the Town Administrator to have conversations with some employees in the police department to determine whether she could be a resource for the Town and its employees in working through conflict.

244.    Attorney Gehris further confirms that she recalls having that conversation with Sulivan, and that her records reflect that it took place on March 19, 2021, the same day the BOS directed him to speak to her.

245.    No written or testimonial evidence was put forth at the Hearing in support of Beijer's claim that Sullivan refused to mediate his request for accommodation due to his back injury.

**Poirier's Retaliation Extended Beyond Seeking
Sullivan's Termination**

246.    Poirier testified at the Hearing that if he had knowledge or information that Sullivan had credibility issues and did not issue written discipline, then it would be neglect of his own duties as Chief.

247.    On or around January 13, 2021, Poirier provided materials to the New Hampshire Office of the Attorney General asserting that Sullivan had committed a violation of Section 643:1 of the New Hampshire Criminal Code which makes it a crime for a public servant to, for the benefit of himself or another, knowingly commit an unauthorized act, or to knowingly refrain from performing a duty imposed on him by law or clearly inherent in the nature of his office.

248.    In support of his referral, Poirier apparently prepared a timeline and provided the BPD schedule, Sullivan's weekly timesheet, incident reports, Belknap County Sheriff dispatch reports and recordings, a BPD General Order and other materials.

249.    Upon information and belief, Poirier reported to the Attorney General words that conveyed that on or about December 27, 2020, Sullivan was on duty when a call came into the 911 dispatch. The caller claimed it was accidental, but per procedure, an officer was required to do a safety check at the residence of the caller.

250.    Upon information and belief, Poirier claimed that the safety check was the responsibility of Sullivan, but he failed to fulfill his responsibility and shortly thereafter, a resident at the calling address committed suicide with a firearm.

251.    If Sullivan had failed to respond to a call that he was responsible for, resulting in a citizen of Barnstead losing their life, and then also failed to step forward to address his role in the incident, that would certainly reflect on his credibility as a police officer.

252.    Despite these alleged facts and Poirier's own sworn testimony that it would be neglect of his duty if he did not issue a written reprimand where he had knowledge reflecting on Sullivan's credibility, Poirier did not issue any kind of written reprimand or warning, or do anything else to bring the matter to Sullivan's attention.

253.    Instead, Poirier surreptitiously filed a criminal conduct referral with the State Attorney General, and waited for a criminal investigation into Sullivan to be opened by that office.

254.    Relying on Poirier's information, the Attorney General's Public Integrity Unit opened an investigation into Sullivan's conduct, on April 16, 2024 – the exact day that Poirier submitted the second Status Notification Form updated to reflect that Sullivan was suspended due to "Active Criminal Investigation."

255.    Contrary to Poirier's claim, Sullivan was neither on call nor on duty on

December 27, 2020. Despite this, Sullivan was actually working at the time the call

came in, and was covering another call because the Department was so short-staffed

that the Belknap County dispatcher would regularly call Sullivan during his time off

when there were no officers available to respond.

256.    Because Sullivan was engaged when the 911 mistake call came in, he

delegated responsibility for the safety check at that residence to on-duty Officer

Valentina Gigli, telling her to "definitely check on [the 911 accidental caller's address]".

257.    Poirier and Officer Gigli are extended family by marriage.

258.    Upon information and belief, when Poirier referred this incident to the

Attorney General, he knew that Officer Gigli was the officer who failed to perform her

duty by not going to the caller's address.

259.    Sullivan remained under investigation until September 7, 2021 when the

case was closed due to insufficient evidence that Sullivan had been working, was

supposed to go to the 911 call, or received any benefit from failing to do so.

260.    The state investigation concluded that responsibility for the call had been

properly delegated to Officer Gigli.

261.    Directly due to Poirier's conduct in making these false accusations,

Sullivan was forced to incur additional legal fees and suffered more harm.

**Sullivan Was Never Notified of His Termination**

262.    As noted above, the BOS did vote to terminate Sullivan's employment,

but on grounds that differed from those identified in the March 30, 2021 Termination

Recommendation letter he received from the BOS.

263.    Sullivan was never provided with the notice and hearing required by

RSA 41:48 on the issue of whether he had refused to attend mediation and whether he had refused to answer the Board's questions at the Hearing.

264.     Notably, the Board did not ask any specific questions at the Hearing. Rather Sullivan, on the advice of counsel, did not agree to provide any testimony after Poirier claimed that Sullivan was under active criminal investigation but refused to reveal any details regarding those allegations.

265.     There was no suggestion of criminal conduct or allegations included in the pre-Hearing notice Sullivan received (the Termination Recommendation), so this line of inquiry was itself an improper violation of RSA 41:48.

266.     The Board made no findings with respect to the specific allegations in the Termination Recommendation.

267.     Neither the Town nor the BPD ever sent Sullivan official notice that his employment had been terminated and that he had been dismissed from his employment.

268.     The failure to notify Sullivan of his termination, provide him with information regarding his benefits (fringe and retirement), and provide him with the contents of all employment records related to his termination, was a direct violation of BPD SOP# 17-00022 – Discipline.

269.     The only communication Sullivan received was a letter, dated July 2, 2021, from HealthTrust, advising him how to elect COBRA benefits.

270.     Poirier submitted a Employee Status Notification Form "B" dated August 4, 2021 to the PSTC reflecting that Sullivan had been discharged from his employment.

## COUNT I – WRONGFUL TERMINATION

**(Town of Barnstead, Beijer and Poirier in their individual capacity)**

271.    The preceding paragraphs are incorporated by reference herein as if restated in their entirety.

272.    At all times relevant hereto, it was the duty of the Town of Barnstead to provide Sullivan with tolerable working conditions and to refrain from punishing him from doing that which public policy would encourage, or refusing to do that which public policy would condemn.

273.    Public policy encourages law enforcement officers to report violations of the law, regardless of who commits them.

274.    Public policy encourages law enforcement officers to report violations of department policy and regulations, particularly where such violations could compromise police operations.

275.    Public policy encourages police officers to report misconduct, especially potential illegal conduct, by other law enforcement officers.

276.    It was the duty of the Town/BOS to protect Sullivan from retaliation related to his reports to the BOS and his participation in the investigation into Poirier's conduct.

277.    The International Association of Chiefs of Police ("IACP") seeks to require police departments to report serious infractions of departmental policy, procedure, or rules. The IACP also prohibits retaliatory conduct or action against employees who make such reports.

278.    Wrongful termination claims based on violations of public policy sound in

tort.

279.    Beijer and Poirier were not Sullivan's employer, but they can be held individually liable for the tortious activity they authorized, even if on behalf of the Town or the BPD.

280.    The Town is liable for the acts of its employees and agents acting within the scope of their designated duties under the recognized theory of *respondeat superior*.

281.    Upon information and belief, Beijer and Poirier were communicating directly outside of the BOS meetings about how to respond to the information brought forth by Sullivan at the August 2020 non-public BOS meetings.

282.    Upon information and belief, Beijer and Poirier had not only authorized tortious activity against Sullivan, they were also the architects of said activity as described herein.

283.    In subjecting Sullivan to months of retaliation from Poirier as described above and refusing to intervene to protect him, leading to Sullivan's discharge, Defendants breached their respective duties to Sullivan.

284.    Because Defendants' acts in terminating Sullivan were willful, wanton, and/or malicious, Sullivan is entitled to recover enhanced compensatory damages.

## COUNT II – CIVIL CONSPIRACY

### (Beijer, Poirier)

285.    The preceding paragraphs are incorporated by reference herein as if restated in their entirety.

286.    Beijer and Poirier are friends. When Beijer learned that Sullivan and Leavitt were lodging complaints about Poirier's conduct, she alerted Poirier, despite the

promise of confidentiality and protection from retaliation.

287.    Upon information and belief, Beijer disclosed non-public meeting times to Poirier and he/she/they in turn disclosed this information to the general public so that those individuals could coincidentally be present at town offices and observe which police officers went into the meeting room to speak to the BOS.

288.    Upon information and belief, Beijer and Poirier agreed that Sullivan's employment should be terminated in retaliation for his reports to the BOS.

289.    Beijer and Poirier conspired to present unfair and inaccurate information to the BOS, which BOS members said they relied on in reviewing the termination decision.

290.    Beijer's and Poirier's conduct directly resulted in the termination of Sullivan's employment from BPD.

291.    Plaintiff has incurred damages because of Defendants' conduct.

## COUNT III – PROCEDURAL DUE PROCESS

**(Town of Barnstead, Beijer and Poirier,
individually and in their official capacity)**

**42 U.S.C. § 1983**

**1st, 5th and 14th Amendments to the U.S. Constitution,**

**N.H. Const. Pt. 1, Art. 35**

292.    The preceding paragraphs are incorporated by reference herein as if restated in their entirety.

293.    Sullivan could only be removed from his position as a full-time police officer for good cause and after notice and a fair hearing consistent with New Hampshire law.

294.    Sullivan had a property interest in his position as a statutorily vested,

full-time police officer.

295.    Sullivan was entitled to be fully informed of the allegations against him prior to the hearing required pursuant to RSA 41:48.

296.    Because Sullivan was not informed that the mediation issue would be part of the Hearings and the decision against him, Sullivan was deprived of the opportunity to put all of his facts before the decision-maker.

297.    Sullivan has a liberty interest in pursuing and engaging in his chosen profession and benefiting from his decades of law enforcement experience.

298.    While on unpaid suspension and then after his termination, from March 30, 2021 through the present, Sullivan has been deprived of all income.

299.    The First, Fifth, and Fourteenth Amendments to the United States Constitution, and Article Thirty-Five to Part I of the New Hampshire Constitution all guarantee to Sullivan a constitutional right to due process.

300.    Sullivan was ultimately terminated without the Town, the BOS, Poirier or Beijer following appropriate procedures.

301.    Sullivan was disciplined for conduct for which other officers received no discipline.

302.    Sullivan's discipline violated BPD SOPs and were clearly contrived to justify a termination decision after combing through years of records trying to manufacture cause, in one case even reprimanding Sullivan on a case where he had previously received a Commendation.

303.    Beijer presided over Sullivan's Hearing, refusing to recuse herself, repeatedly jumping in to interfere and protect Poirier, even though she believes

Sullivan has threatened to harm her.

304.    Sullivan was ultimately dismissed for conduct that (1) wasn't even noticed; and (2) was misrepresented by Beijer.

305.    Defendants knowingly, maliciously, wantonly, recklessly and with ill will deprived Sullivan of his liberty and property interests as set forth herein, and Sullivan was damaged by Defendants' conduct.

306.    Because Defendants' conduct was motivated by malic, evil motive or intent, and/or because such conduct involved reckless or callous indifference to Sullivan's constitutionally protected rights, Defendants are liable for punitive damages under 42 U.S.C. § 1983.

307.    Pursuant to 42 U.S.C. § 1988, Sullivan is also entitled to recover his attorney's fees.

### COUNT IV – SUBSTANTIVE DUE PROCESS

**(Town of Barnstead, Beijer and Poirier,
individually and in their official capacity)**

**42 U.S.C. § 1983**

**1st, 5th and 14th Amendments to the U.S. Constitution,**

**N.H. Const. Pt. 1, Art. 35**

308.    The preceding paragraphs are incorporated by reference herein as if restated in their entirety.

309.    Poirier's conduct in disciplining Sullivan for reporting Poirier's own misconduct, which is retaliation on its face, is so egregious that it is truly shocking to the conscience.

310.    Poirier, an officer of the law, the most senior officer at BPD, repeatedly fabricated allegations in his quest to see Sullivan terminated.

311.    Beijer, the Chair of the BOS, fabricated allegations in her effort to steer the BOS toward the result she wanted: Sullivan's termination.

312.    Under Poirier's framework, he can discredit the allegations simply by calling Sullivan a liar and discipling him for the substance of his report on Poirier.

313.    Beijer and Poirier, overtly or covertly, in concert with one another and with other persons both known and unknown, did connive, collude, and conspire to deprive Sullivan of his procedural rights, his property and liberty interests, as guaranteed by law and the Constitutions of the United State and New Hampshire.

314.    Sullivan has been damaged as a result of Defendants' Conduct.

## COUNT V – VIOLATION OF RSA 41:48

### (Town of Barnstead)

315.    The preceding paragraphs are incorporated by reference herein as if restated in their entirety.

316.    As a full-time, vested police officer, Sullivan could only be removed from his position for good cause, after notice and a hearing.

317.    Sullivan did not receive actual notice of the alleged infractions for which the BOS ultimately decided to terminate his employment.

318.    The hearing Sullivan received was completely infected with bias, arbitrarily limited, and presided over by at least three Selectman who were on the record with a bias that would have prevented them from sitting on a jury had this issue been heard in a court of law.

319.    The Town terminated Sullivan without good cause.

320.    The stated cause was manufactured and dependent on false and easily

disproven allegations.

321.    The alleged "cause" against Sullivan did not rise to the level of a

substantial cause sufficient to meet the "for cause" requirement of the statute to justify

Sullivan's termination.

322.    Sullivan has suffered damages as a result of the Town's conduct as

described herein.

## COUNT VI – WHISTLEBLOWER PROTECTION ACT

### RSA 275-E

### (Town of Barnstead)

323.    The preceding paragraphs are incorporated by reference herein as if

restated in their entirety.

324.    As described above, Sullivan complained to the BOS about conduct by

Poirier that violates state and Federal laws, conduct that violates state policing

requirements, and conduct that raises significant public safety concerns, including, and

not limited to, the use of public funds for a Trump campaign event, misappropriation of

public funds, failure to properly complete background investigations before hiring and

disregard of the psychological evaluation, and the presence of the odor of alcohol on

Poirier while working.

325.    Sullivan also complained about Poirier's ongoing campaign of retaliation

and filed a formal Whistleblower complaint with the New Hampshire Department of

Labor.

326.    Sullivan's complaints were made in good faith, and were intended to

further the interests of the citizens of Barnstead, employees of the Town, and the public

policy of New Hampshire.

327.    Sullivan was entitled to protection from retaliation for reporting these

violations of the law.

328.    Barnstead ignored Sullivan's repeated requests for intervention and

protection from retaliation.

329.    As a result, Sullivan has been damaged and his damages were entirely

foreseeable and include: lost wages (past, present, and future), lost benefits, harm to his

reputation, present and future emotional distress.

330.    The Town is liable to Sullivan for damages sustained, to include

attorney's fees for the cost of this litigation.

## COUNT VII –INTERFERENCE WITH CONTRACTUAL RELATIONSHIP

### (Beijer and Poirier)

331.    The preceding paragraphs are incorporated by reference herein as if

restated in their entirety.

332.    As set forth in the preceding paragraphs, both prior to and subsequent to

Sullivan being placed on leave, he was subjected to a pattern of harassment, retaliation,

intimidation and conspiracy, that began as early as November 2020.

333.    Sullivan had an economic relationship with the Town due to his status as

a full-time, vested police officer for the Town, and Beijer and Poirier were at all times

aware of this economic relationship.

334.    Beijer and Poirier knowingly, wantonly, recklessly, negligently,

maliciously, intentionally and improperly interfered with Sullivan's employment with

the Town.

335.    Sullivan has suffered damages as a result of the defendant's conduct as described herein, for which Beijer and Poirier are liable.

## COUNT VIII – DEFAMATION PER SE AND ORDINARY DEFAMATION

**(Town of Barnstead, Beijer in her individual capacity, Poirier in his official and individual capacities)**

336.    The preceding paragraphs are incorporated by reference herein as if restated in their entirety.

337.    Defendants did knowingly publish false statements about Sullivan in meetings, reports, correspondence and other writings, and in spoken words to one another and others.

338.    The above writings were published to the town selectman and other employees and non-employees. The falsities included allegations of criminal behavior, moral turpitude, professional incompetence, negligence toward children, lying to a superior officer, lying to court officers, and making false official reports.

339.    In violation of BPD's SOPs this highly prejudicial information was made available to one another and others, and steps were taken to ensure publicity.

340.    Sullivan has suffered damages as a result of the conduct as described herein.

341.    Defendants are liable for Sullivan's damage.

## COUNT IX – FALSE LIGHT INVASION OF PRIVACY

**(Poirier, Beijer)**

342.    The preceding paragraphs are incorporated by reference herein as if restated in their entirety.

343.    Beijer and Poirier took intentional steps to make information public that did not accurately reflect the truth about Sullivan, and which reflected poorly on him.

344.    Any reasonable person would find the things that defendants publicized about Sullivan to be highly offensive.

345.    Beijer and Poirier acted with knowledge that the information was not true when he/she/they publicized it, or with reckless disregard for that falsity of the publicized matter and the false light it would place Sullivan.

346.    Sullivan has suffered damages as a result of the defendants' conduct as described herein.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff prays that this Honorable Court:

a.    Enter judgment in favor of the Plaintiff for compensatory damages to include back pay, front pay, loss of retirement value, expenses incurred incident to seeking medical care, benefits, loss of opportunity, pain, suffering and mental anguish.

b.    Enter judgment in favor of the Plaintiff for enhanced compensatory damages for harm resulting from wanton, reckless, malicious, or oppressive conduct of the Defendants as permitted by law.

c.    A declaration that the actions of Defendants are illegal, unconstitutional, and repugnant to public policy;

d.    Enter an award for all costs, expenses, and actual monetary losses sustained by the Plaintiff incident to the prosecution of these

claims and the defense against his illegal termination, including

attorney's fees, as permitted by law;

e.    Enter an award for pre- and post-judgement interest where

appropriate;

f.    Enter an order prohibiting the Defendants from any further

prohibited retaliation, interference or defamation of Plaintiff; and

g.    Any other relief the Court deems just and proper.


**THE PLAINTIFF DEMANDS A JURY TRIAL.**


Dated: June 22, 2024                    Respectfully submitted,

JAMES SULLIVAN
By his attorney:


  /s/   *Kamee Verdrager*
Kamee B. Verdrager, Esq. (NH #21266)
KBV LAW
P.O. Box 90
W. Nottingham, NH 03291
(603) 488-1473 (phone)
kbv@kbvlawpc.com