UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

James Sullivan,
     Plaintiff

     v.                                        Case No. 24-cv-181-SM-TSM
                                               Opinion No. 2025 DNH 081

Town of Barnstead, N.H.,
Paul Poirier, and Diane Beijer,
     Defendants


**O R D E R**


In January of 2019, James Sullivan was hired as a Detective Sergeant by the Barnstead Police Department.  At a public hearing conducted on June 22, 2021, the Barnstead Select Board voted to terminate his employment.  This litigation followed.


In his complaint, Sullivan asserts seven state common law and statutory claims arising out of what he describes as his wrongful termination.  He also asserts two federal claims that form the basis of this court's subject matter jurisdiction: first, that his pretermination hearing failed to comply with the minimum requirements mandated by the Due Process Clause of the Fourteenth Amendment; and, second, that defendants' allegedly wrongful conduct surrounding his discharge was so extreme and

conscience-shocking that it violated his substantive due process rights. Defendants move for judgment on the pleadings with respect to those two federal claims. <u>See</u> Fed. R. Civ. P. 12(c). Plaintiff objects. For the reasons discussed, that motion is granted.

## Standard of Review

Rule 12(c) of the Federal Rules of Civil Procedure provides that, "After the pleadings are closed - but early enough not to delay trial - a party may move for judgment on the pleadings." A motion for judgment on the pleadings is subject to the same standard of review applicable to a motion to dismiss under Rule 12(b)(6). <u>See</u> <u>Portugues-Santana v. Rekomdiv Int'l, Inc.</u>, 725 F.3d 17, 25 (1st Cir. 2013). Accordingly, the court must accept as true all well-pled facts in the plaintiff's complaint and indulge all reasonable inferences in his favor. <u>See</u> <u>Doe v. Brown Univ.</u>, 896 F.3d 127, 130 (1st Cir. 2018); <u>S.E.C. v. Tambone</u>, 597 F.3d 436, 441 (1st Cir. 2010). There is, however, a slight difference between a 12(b)(6) motion and one filed pursuant to 12(c): when ruling on the latter, the court considers the pleadings as a whole, including the defendant's answer. But, given the deferential standard of review, the court must treat as false any allegations in the answer that contradict those in the complaint. <u>See</u> <u>Goodman v. Williams</u>, 287

F. Supp. 2d 160, 161 (D.N.H. 2003).  See also Aponte-Torres v.
Univ. of Puerto Rico, 445 F.3d 50, 54-55 (1st Cir. 2006) (citing
5C C. Wright & A. Miller, Fed. Prac. & Proc. § 1368 (3d ed.)).

So, as is the case with a motion to dismiss, to survive a
motion for judgment on the pleadings, the complaint must allege
sufficient facts to support a "plausible" claim for relief.  See
Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  To satisfy that
plausibility standard, the factual allegations in the complaint,
along with reasonable inferences drawn from those allegations,
must show more than a mere possibility of liability – that is to
say, "a formulaic recitation of the elements of a cause of
action will not do."  Bell Atl. Corp. v. Twombly, 550 U.S. 544,
555 (2007).  See also Lyman v. Baker, 954 F.3d 351, 359-60 (1st
Cir. 2020) ("For the purposes of our review, we isolate and
ignore statements in the complaint that simply offer legal
labels and conclusions or merely rehash cause-of-action
elements.") (citation and internal punctuation omitted).

In other words, the complaint must include well-pled (i.e.,
non-conclusory, non-speculative) factual allegations as to each
of the essential elements of a viable claim that, if assumed to
be true, allow the court to draw the reasonable and plausible
inference that the plaintiff is entitled to the relief sought.

See Tasker v. DHL Retirement Savings Plan, 621 F.3d 34, 38-39 (1st Cir. 2010).

**Pertinent Background**

Sullivan's complaint is lengthy. It is comprised of 57 pages and includes nearly 350 numbered paragraphs. If true, the allegations paint a decidedly unflattering picture of Barnstead Chief of Police Paul Poirier and the Chair of the Barnstead Select Board, Diane Beijer. Among other things, they include claims of improper use of public funds, unlawful retaliation in response to a whistleblower report, and generalized corrupt practices. While those allegations form the basis of Sullivan's state law claims and provide a backdrop to his allegedly wrongful termination, many have only marginal relevance to Sullivan's federal claims. The court will, then, recount only those facts that relate in some way to Sullivan's procedural and substantive due process claims.

Sullivan began working as a police officer in 2000, as a member of the Merrimack Police Department. For the first ten years of his tenure there, Sullivan was a colleague of Paul Poirier. Eventually Poirier left the Merrimack force and became the Chief of Police in Barnstead, New Hampshire. Then, in 2018, Poirier began recruiting Sullivan to join the Barnstead Police

4

Department.  In January of 2019, Sullivan accepted Poirier's invitation: he applied for, and was hired as, a Detective Sergeant and second in command of the Barnstead police force. Soon, however, the men's relationship began to sour.

Sullivan identifies a few precipitating events, but one of the most significant appears to have been Poirier's decision to actively solicit a campaign visit to the town by then president and candidate for reelection Donald Trump.  When that campaign stop became a reality, Poirier allegedly required all officers in the department to attend and made clear that their failure to do so would result in termination.  Chief Poirier also filmed an appearance for "Team Trump Online" - while wearing his police uniform - and was publicly identified as a Trump "surrogate." According to Sullivan, multiple officers were troubled by Poirier's conduct and the Select Board received numerous complaints from citizens about the police department's participation in the campaign event, as well as the use of police department funds and resources in support of a political campaign.

Eventually, Sullivan and another officer brought their concerns about Poirier's troubling conduct (including, but not limited to, his behavior surrounding the Trump campaign

appearance) to the Barnstead Select Board.  To eliminate any
possibility that Poirier might retaliate against the officers,
the Select Board assured them that their complaints would remain
confidential.  That proved to be untrue.  Moreover, says
Sullivan, the Board did nothing to address the officers'
concerns about Poirier.

Subsequently, Sullivan received a report from a different
officer about unprofessional conduct in which Poirier had
engaged at the scene of a crime (including, among other things,
the allegation that Poirier had the "obvious odor" of an
alcoholic beverage on his breath).  After receiving that report,
Sullivan again contacted the Select Board, which voted to hire
an independent investigator to look into Poirier's conduct as
Chief.  Poirier was placed on administrative leave pending the
results of the investigation.  Those results - detailed in a 41-
page report - need not be recounted.  It is sufficient to note
that they were not favorable to Chief Poirier.

Following his administrative leave of roughly three months,
Poirier was reinstated as Chief of Police, subject to a one-year
probationary period.  According to Sullivan, that is when
Poirier began retaliating against him and laying the groundwork
for Sullivan's eventual discharge.  The details of that alleged

pattern of discrimination are set forth at length in the

complaint.  They include claims that Poirier intentionally

placed Sullivan in potentially dangerous situations without

backup (while providing backup to other officers in identical

situations), attempted to sabotage Sullivan's efforts to

complete a mandatory annual physical fitness test, knowingly

filed a false criminal charge against Sullivan with the New

Hampshire Office of the Attorney General (which ultimately

exonerated Sullivan of any wrongdoing), and defamed Sullivan by

publicly questioning his character and credibility (going so far

as to suggest - at a public hearing - that Sullivan should be

placed on New Hampshire's "Laurie List").[1]

---

[1]    The "Laurie List" is a database of police officers who have "engaged in misconduct reflecting negatively on their credibility or trustworthiness." New Hampshire Ctr. for Pub. Int. Journalism v. New Hampshire Dep't of Just., 173 N.H. 648, 650 (2020).  It is maintained by the New Hampshire Department of Justice and serves to alert state prosecutors of the need to inquire into whether an officer's personnel file might contain "exculpatory evidence" - that is, evidence that the officer engaged in misconduct reflecting negatively on their credibility as a witness, such as reports that the officer previously testified falsely under oath, fabricated evidence, etc.  See generally RSA 105:13-d.  See also State v. Laurie, 139 N.H. 325 (1995).  Inclusion on the "Laurie List" carries a significant stigma and "police officers have a weighty countervailing interest in insuring that their names are not placed on the list when there are no proper grounds for doing so." Duchesne v. Hillsborough Cnty. Att'y, 167 N.H. 774, 782-83 (2015).

On March 30, 2021, the Select Board notified Sullivan that
Poirier had recommended that Sullivan's employment be terminated
for "insubordination and dereliction of duties."  Sullivan was
immediately suspended without pay until further decision of the
Board.  That termination notice identified eight grounds for
dismissal.  Roughly ten days later, Poirier issued more than 30
written reprimands criticizing Sullivan's police work, which he
placed in Sullivan's personnel file.

On May 18, 2021, and continuing to a second evening on June
1, the Select Board convened a public hearing to consider
Poirier's recommendation that Sullivan's employment be
terminated.  During the course of that hearing, Poirier produced
approximately 50 written reprimands he claimed had been issued
to Sullivan.  It is not entirely clear what Sullivan is saying
with respect to those reprimands, but he seems to assert that he
was not given the opportunity to respond to them before they
were placed in his personnel file, see complaint at paras. 170-
71, and at least one of them was presented to him after the
first hearing night (but prior to the second night), id. at
para. 218.  He also challenges the merits of those reprimands,
saying many are either misleading, false, or relate to "late"
reports that Sullivan had already completed.  Sullivan also says
there is evidence - including Poirier's own sworn testimony to

the Select Board - that shows (or at least implies) Poirier had
planned to create unfounded written reprimands to support
Sullivan's termination.

According to Sullivan, prior to reporting his concerns
about Poirier to the Select Board, he had never received even a
single written reprimand.  Indeed, says Sullivan, in July of
2020 (just eight months before he received the termination
notice), he received a "Commendation and Exemplary Service Unit
Award" in connection with his handling of a shooting incident.
But, in retaliation for Sullivan's reports to the Select Board
about Poirier's inappropriate conduct, Poirier issued Sullivan a
written reprimand in connection with that very same
commendation-producing incident.

Because they are a part of Sullivan's federal due process
claims, three additional factual allegations merit reference.
According to Sullivan,

> On or about February 16, 2021, Sullivan emailed the
> BOS [Select Board] indicating that because Poirier's
> harassment and retaliation was ongoing, he would no
> longer communicate with Poirier without including a
> BOS member or the Town Administrators as a witness or
> in writing to avoid unmonitored communication with
> Poirier.

Complaint (document no. 1) at para. 154.  Sullivan says the
Select Board misinterpreted that statement as a refusal to "work
with the chief or anyone in the department," id. at para. 233,
and it was cited as one of three reasons for his discharge.

    The other two bases for Sullivan's discharge were his
alleged refusal to attend mediation that was mandated by the
Board, and his refusal to answer questions posed by the Board at
the pretermination hearing.  See Id. at para. 233.  With respect
to the former charge, Sullivan says no evidence was introduced
at his hearing that showed he failed or refused to attend
mediation that had been ordered by the Select Board.  And, with
regard to his decision not to testify at the pretermination
hearing, Sullivan says he was given a "Garrity Warning" but, on
the advice of counsel, he refused to sign it.

    The New Hampshire Supreme Court has described a "Garrity
Warning" as follows:

        Such a warning informs the accused that the purpose of
        questioning is to assist in determining whether to
        impose administrative discipline.  Even if the accused
        were to disclose during questioning information
        indicating that he may be guilty of criminal conduct,
        the warning explains that neither his self-
        incriminating statements, nor the fruits thereof will
        be used against him in any criminal proceeding.  The
        warning further states that if the accused refuses to
        answer questions or fails to give truthful answers, he

>       will be subject to disciplinary action, up to and
>       including dismissal.

In re Waterman, 154 N.H. 437, 442 (2006) (citing Garrity v. New

Jersey, 385 U.S. 493 (1967)).  Sullivan says he refused to sign

the Garrity Warning and declined to respond to board member

questions because "Poirier stated at the public Hearing that

Sullivan was being investigated for criminal activity, but

refused to provide Sullivan with any specific information

including the nature of the charges, who had referred the matter

for criminal investigation, or to what agency the matter had

been referred."  Complaint at para. 212.


        On June 22, 2021, the Select Board voted to terminate

Sullivan's employment.  According to Sullivan,

>       Chairwoman Beijer announced before the vote "to be
>       clear, the specific reasons for termination were
>       written notification from Sergeant Sullivan that he
>       would not work with the chief or anyone in the
>       department, his refusal to attend mediation that was
>       mandated by the Board, and his refusal to answer
>       questions by the Board at the hearing."

Complaint at para. 233.  But, says Sullivan, "the BOS did not

vote on the [eight] items listed in the Termination

Recommendation, so there was never any finding that the evidence

presented was sufficient to prove those allegations."  Id. at

para. 235.  See also Id. at para. 266 ("The Board made no

findings with respect to the specific allegations in the

Termination Recommendation.").

## Discussion

I.  <u>Procedural Due Process</u>.

Initially, it probably bears noting that neither Sullivan

nor the defendants claim that Sullivan's employment or his

discharge was governed by the terms of a contract or collective

bargaining agreement.  Instead, Sullivan says (and defendants do

not dispute) that his discharge was subject to the provision of

New Hampshire Revised Statutes Annotated ("RSA") 41:48, which

provides:

> Any permanent constable or police officer who is
> either elected under the provisions of RSA 41:47 or
> appointed for full-time duty under the provisions of
> RSA 105:1, and who is in compliance with the
> requirements of RSA 106-L:6, shall continue to hold
> such office during good behavior, unless sooner
> <u>removed for cause</u> by the selectmen, <u>after notice and
> hearing</u>, or unless the town has rescinded its action
> as provided in RSA 41:47.  Any such elected permanent
> constable or police officer shall be deemed to be a
> permanent policeman, and entitled to benefits under
> the provisions of RSA 103 if otherwise qualified.

N.H. Rev. Stat. Ann. § 41:48 (emphasis supplied).  <u>See generally</u>

<u>Boucher v. Town of Moultonborough</u>, 176 N.H. 271, 275 (2023) ("We

have long recognized that RSA 41:48 affords police officers a

pretermination hearing before their local select board.  The

statute affords procedural protections — notice and a hearing —
and substantive protections — a 'for cause' standard — prior to
an officer being removed by the selectmen.") (citations
omitted).  If a police officer is dissatisfied with the decision
of the select board, he or she may obtain review by the state
superior court "for illegality, injustice or unreasonableness."
Ingersoll v. Williams, 118 N.H. 135, 139 (1978).  Sullivan did
not pursue that avenue of relief.

        As a matter of law, then, the provisions of RSA 41:48 vest
police officers like Sullivan with a constitutionally-protected
"property interest" in their continued employment.  As the
Supreme Court has noted:

> Property interests are not created by the
> Constitution, they are created and their dimensions
> are defined by existing rules or understandings that
> stem from an independent source such as state law.
> The [state statute at issue] plainly creates such an
> interest.  Respondents were "classified civil service
> employees," entitled to retain their positions "during
> good behavior and efficient service," who could not be
> dismissed "except for misfeasance, malfeasance, or
> nonfeasance in office."
>
> The statute plainly supports the conclusion, reached
> by both lower courts, that respondents possessed
> property rights in continued employment.  Indeed, this
> question does not seem to have been disputed below.

Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538–39
(1985) (citations omitted).  That, in turn, means that Sullivan

could not be divested of his state-created property interest in
continued employment absent a process that was consistent with
the minimum requirements of the Due Process Clause of the
federal Constitution.  See Id. at 546 ("The opportunity to
present reasons, either in person or in writing, why proposed
action should not be taken is a fundamental due process
requirement.  The tenured public employee is entitled to oral or
written notice of the charges against him, an explanation of the
employer's evidence, and an opportunity to present his side of
the story.") (emphasis supplied); City of Portsmouth Police
Comm'n/Police Dep't v. Portsmouth Ranking Officers Ass'n, 176
N.H. 14, 21 (2023) ("Under Loudermill, a public employee with a
property interest in continued employment is entitled to notice
of the charges against him and an opportunity to be heard before
termination.  The function of this Loudermill process is to
provide an opportunity to test the evidence supporting a
proposed termination and thereby prevent wrongful
termination.").

    According to Sullivan, the Barnstead Select Board failed to
comply with those constitutionally-mandated minimums before
terminating his employment.  Specifically, Sullivan asserts that
the "Termination Notice" the Select Board provided to him stated
that "Poirier had recommended that his employment with BPD be

14

terminated immediately for 'insubordination and dereliction of duties.'"  Complaint at para. 161.  That notice went on to identify the following eight (8) bases for his proposed discharge:

    a.    Failure to report to duty;
    b.    Failure to call out prior to shift;
    c.    Failure to produce a doctor's note stating you cannot
          work;
    d.    Failure to undertake and complete investigations;
    e.    Failure to produce appropriate paperwork;
    f.    Refusal to follow orders;
    g.    Refusal to communicate with the Chief; and
    h.    Refusal to communicate with department employees.

Id. at para. 162.


    But, as noted above, Sullivan says the Select Board's vote to terminate his employment was actually based upon "written notification from Sergeant Sullivan that he would not work with the chief or anyone in the department, his refusal to attend mediation that was mandated by the Board, and his refusal to answer questions by the Board at the hearing."  Id. at para. 233.  Consequently, says Sullivan, he was not notified prior to the pretermination hearing that his (alleged) failure to attend mediation or that his decision not to testify before the Board might amount to "good cause" to terminate his employment. Moreover, he claims that Chairperson Beijer was biased against

him and her refusal to recuse herself from the hearing
irreparably infected his pretermination hearing with unfairness.

Even generously construing the factual allegations of the
complaint, however, Sullivan has not set forth the essential
elements of a viable procedural due process claim.

    A.   <u>Failure to Attend Mediation</u>.

As a preliminary matter, Sullivan says he did, in fact,
attend the mandated mediation and claims there was insufficient
properly-introduced evidence at his pretermination hearing to
support the contrary conclusion.  Thus, he says his discharge
"for good cause" was not supported by the evidence.  But, that
argument goes to the merits of the Select Board's decision (and,
relatedly, to Sullivan's state law wrongful termination and
related state law claims).  It does not form a material part of
his federal procedural due process claim, which turns simply
upon whether he had adequate notice of, and a fair opportunity
to rebut, the charge that he was "insubordinate" and "refused to
follow orders," to include the allegation that he failed to
attend the mandated mediation.

Next, Sullivan says he did not receive fair warning that
the mediation issue was before the Board or that his alleged

failure to attend might be a basis for termination.  But, the
notice provided to Sullivan specifically stated that his
proposed discharged was based upon "insubordination" and his
"refusal to follow orders."  Complaint at paras. 161-62.
Plainly, his (alleged) failure to attend mandated mediation
would constitute both.  He has cited no support for the notion
that, in the context of a pretermination hearing, the United
States Constitution requires a more detailed specification of
the charges lodged against him.  Moreover, the mediation issue
was plainly discussed at the hearing and Sullivan had the
opportunity to rebut the allegation that he failed to attend as
directed.

But, says Sullivan, he was not provided with adequate time
to address all the charges leveled against him - including the
mediation issue - or the large number of documents Poirier
presented in support of those charges.  Sullivan's
pretermination hearing spanned two evenings (May 18 and June 1,
2021) and he was afforded a total of 3.5 hours of time to rebut
the charges against him (2.5 hours on the first evening and 1
hour on the second).  While the evidence produced against him
was voluminous, it cannot be said that he was deprived of a fair
opportunity to summarily address the charges against him and
give his side of the story - even if he would have preferred to

have had more time to do so.  And, again, it is plain that the
mediation matter was discussed at the hearing, presumably as a
basis for the allegation that Sullivan was insubordinate and
refused to follow orders.

Even liberally construing the complaint's factual
allegations, those relating to the "mediation issue" are
insufficient to plausibly state the essential elements of a
viable federal procedural due process claim.  As the Supreme
Court has made clear, "the pretermination hearing <u>need not
definitively resolve the propriety of the discharge</u>.  It should
be an <u>initial check</u> against mistaken decisions — essentially, a
determination of whether there are reasonable grounds to believe
that the charges against the employee are true and support the
proposed action."  <u>Loudermill</u>, 470 U.S. at 545-46 (emphasis
supplied).[2]

B.    <u>Bias of the Board Chair</u>.

Although Sullivan's alleged failure to attend mandated
mediation was plainly discussed at the hearing, Sullivan says
the only "evidence" of his failure to attend mediation was

---

[2]    Whether the New Hampshire constitution affords Sullivan
greater procedural protections than those provided by the
federal constitution is not presently before the court and,
therefore, need not be addressed.

introduced by Chairperson Beijer, "who was present as a fact-finder, not as a witness, and was not sworn in or made available for Sullivan to cross-examine."  Complaint at para. 227.  <u>See also</u> <u>Id</u>. at para. 222 ("Beijer then served as accuser, 'evidence' presenter, unsworn witness, and jury at the Hearing. Beijer asked Sullivan questions about letters and e-mails, then inaccurately characterized their contents, before basing her termination vote on conclusory statements regarding those mischaracterized contents.").  According to Sullivan, Beijer's alleged bias against him and her refusal to recuse herself from the hearing deprived him of his federally-protected due process rights.

Sullivan seems to be confusing the procedural requirements of a civil or criminal trial with those of a pretermination hearing.  The latter, "though necessary, need not be elaborate." <u>Loudermill</u>, 470 U.S. at 545.

> In general, "something less" than a full evidentiary hearing is sufficient prior to adverse administrative action.  Under state law, respondents were later entitled to a full administrative hearing and judicial review.[3]  The only question is what steps were required before the termination took effect. . . ..

---

[3]    As noted above, state law afforded Sullivan a similar full opportunity to obtain review of the Select Board's decision in the state superior court for illegality, injustice, and/or unreasonableness.  <u>See</u> <u>Ingersoll v. Williams</u>, 118 N.H. at 139.

> The tenured public employee is entitled to oral or
> written notice of the charges against him, an
> explanation of the employer's evidence, and an
> opportunity to present his side of the story.

Id. (citations omitted).  See also Chmielinski v. Massachusetts,
513 F.3d 309, 316 (1st Cir. 2008) ("Chmielinski's allegations of
procedural due process all concern the adequacy of the hearing
he was provided.  The standard the defendant must meet here is
not high: the U.S. Constitution requires only [notice and] some
pretermination opportunity to respond. . . . a requirement that
was clearly met on the facts of this case.  The Constitution
requires only an initial check against erroneous decisions, not
that the state follow best practices.") (citations omitted).
So, provided the tenured employee has been given notice and an
opportunity to respond, the procedural protections mandated by
the federal constitution have been met.  "To require more than
this prior to termination would intrude to an unwarranted extent
on the government's interest in quickly removing an
unsatisfactory employee."  Loudermill, 470 U.S. at 546.

    Moreover, it is well-established that in pretermination
hearings of the sort afforded to Sullivan, the federal
constitution does not require decision-makers (like the members
of the Barnstead Select Board) to act as perfectly neutral and
impartial arbiters.  Indeed, board members are permitted to act

in two roles, serving as both prosecutors and judges.  See,
e.g., Jackson v. Norman, 264 Fed. Appx. 17, 19 (1st Cir. 2008)
("We have held that there is no requirement that the hearing
officer be impartial; indeed, the terminating employer may
preside.")(emphasis supplied).  This is true even under state
law.  See Appeal of Town of Pelham, 124 N.H. 131, 136, 469 A.2d
1295 (1983) ("Under RSA 41:48, when a board of selectmen seeks
to remove a police officer, the officer is notified and afforded
a hearing before the board.  The board is both prosecutor and
judge.").  Federal constitutional concerns arise only when a
hearing officer's bias is so profound that he or she actually
prevents the employee from putting facts before the
decisionmaker or when the decisionmaker bases its decision upon
factual findings that are so unfounded that they could be
explained only by bias.  Jackson, 264 Fed. Appx. at 19 (citing
Chmielinski, 513 F.3d 317-18).


    As the Chmielinski court recognized, "A key concern in
Loudermill was that the employee have an opportunity to present
his side of things to correct errors of fact on which the
termination decision is based.  In theory at least, a
decisionmaker could be so utterly biased as to deprive an
employee of even that error-correction ability."  513 F.3d at
318.  Here, however, Beijer's alleged bias did not rise to that

21

level and Sullivan was not deprived of the ability to address
the claims or evidence leveled against him.  Consequently,
Sullivan's allegations of bias on the part of Beijer are not
sufficient to state a viable claim that his federal procedural
due process rights were violated.

        C.    <u>Sullivan's Refusal to Testify</u>.

Next, Sullivan asserts that he was not notified prior to
his pretermination hearing that his failure to testify might
result in his discharge.  Lack of such notice, he says, amounted
to a plain violation of his federal due process rights.  So,
too, did the Board's effort to force him to surrender his Fifth
Amendment rights and respond to questions posed to him by board
members.

As mentioned earlier, at the pretermination hearing the
Select Board provided Sullivan with a Garrity Warning -
essentially a pledge that, in exchange for his honest responses
to the Board's questions, his testimony before the Board would
not be used against him in any criminal proceeding, and a
warning that the refusal to testify might be considered in the
context of deciding whether his discharge was warranted.
Sullivan says he declined to sign that document and refused to
testify because Poirier would not "identify the nature of the

criminal investigation that he was already apparently the subject of." Complaint at para. 222. Moreover, says Sullivan, the warning was defective because the Board failed to provide him with satisfactory evidence of "authorization from the New Hampshire Attorney General's office or the Belknap County Attorney's office granting Sullivan immunity for his statements" nor did the Board members "provide any assurances that the questions they would be asking were wholly unrelated to the pending criminal accusations." Id. at para. 224.

Regardless of Sullivan's personal assessment of the validity or propriety of the Garrity Warning he received, the decision to sign it or not was plainly his to make. And, once the Board decided to issue that warning, Sullivan was on notice that a refusal to testify, or a failure to testify truthfully, might be considered as a factor weighing in favor of his discharge. See In re Waterman, 154 N.H. at 442. But, says Sullivan, "This was essentially a choice between forfeiting Constitutional rights that Sullivan should never have been compelled to make. Placing Sullivan in this position, indeed demanding that he sacrifice a Constitutional right as the only path to avoid certain termination, deprived him of an opportunity to be heard at a meaningful time and in a meaningful

manner."  Plaintiff's Objection (document no. 10) at 11
(citation omitted).  The court disagrees.

     The Board's offer of the protections afforded by the
Garrity Warning in exchange for Sullivan's truthful testimony
before the Board did not violate his federally protected rights.
Nor were those rights violated when the Board subsequently took
into consideration - as one factor among several supporting his
discharge - his refusal to respond to Board members' questions
about the allegations against him.  Because Sullivan would have
been testifying under a form of duress imposed by state actors,
see Garrity, 385 U.S. at 497-98, such testimony could not have
been used in any subsequent criminal trial - even if the Garrity
warning was, as Sullivan says he suspected, flawed in some way.

     Even assuming that [the plaintiff] had been forced to
     testify under the threat of losing his job, such
     compulsion would have been entirely appropriate: "the
     Constitution permits that very testimony to be
     compelled if neither it nor its fruits are available
     for such use [in a criminal trial]." Lefkowitz v.
     Turley, 414 U.S. 70, 84 (1973); see also Maness v.
     Meyers, 419 U.S. 449, 473 (1975) (White, J.,
     concurring) ("[A] witness may not be required to
     answer a question if there is some rational basis for
     believing that it will incriminate him, at least
     without at that time being assured that neither it nor
     its fruits may be used against him.").

     The record shows that [the plaintiff] was twice
     assured that the internal investigation was conducted
     for administrative purposes only and that the
     investigation and the statements made in course of the

24

investigation could not be used against him in his
criminal proceedings.

Voccola v. Rooney, 136 F. Supp. 3d 197, 209 (D. Conn. 2015)

(emphasis in original).  See also Buckner v. City of Highland

Park, 901 F.2d 491, 495–96 (6th Cir. 1990) ("The state has a

choice between either demanding an accounting from the employee

on job-related matters, in which case it cannot use the

statements in a criminal prosecution, or prosecuting him, in

which case it cannot demand an accounting.  The employer may ask

questions specifically, directly, and narrowly relating to the

performance of his official duties, and demand an accounting

even though the answers tend to incriminate.  Thus, while the

City may not use coerced answers in a criminal proceeding

against the employee, it may terminate that employee for

refusing to answer, so long as that termination is not solely

due to the invocation of the right against self-incrimination.")

(citations and internal punctuation omitted).  See generally

Dwan v. City of Bos., 329 F.3d 275, 278–80 (1st Cir. 2003)

(explaining the scope of an employer's ability to compel an

employee to discuss potentially-incriminating matters related to

his or her employment).

So, contrary to Sullivan's suggestion, he was not offered

"a Hobson's Choice of equally bad options: testify and perhaps

you will unknowingly incriminate yourself or don't testify and
we will terminate your employment."   Plaintiff's Objection
(document no. 10) at 11.   First, the complaint does not allege
that the Board threatened to terminate Sullivan's employment if
he refused to testify.   Rather, Sullivan alleges that his
refusal to testify was <u>later</u> considered as one of several
factors in support of the decision to fire him.   That is a
meaningful difference.   See generally <u>United States v. Stein</u>,
233 F.3d 6, 16 (1st Cir. 2000) ("Unlike the police officers in
<u>Garrity</u>, however, Golenbock was not subject to automatic loss of
her position if she asserted her right not to testify.   While
refusal to waive the Fifth Amendment might increase the risk
that she would be disbarred, disbarment <u>would not result</u>
<u>automatically and without more</u>.   Hence, she was not threatened
with a penalty within the meaning of <u>Garrity</u> for invoking her
Fifth Amendment privilege.") (emphasis supplied).


     Moreover, by issuing Sullivan a Garrity Warning, the Select
Board informed Sullivan that any testimony he gave would not -
indeed, could not - be used against him in any criminal
proceeding.   That Sullivan may have been concerned that the
warning could have been better drafted is of no moment.   By
giving Sullivan the Garrity warning, the members of the Select
Board conceded that they were compelling Sullivan to provide

testimony he might otherwise decline to give by invoking his
Fifth Amendment rights.  The inadmissibility of such coerced
testimony in subsequent criminal proceedings happens as a matter
of law, regardless of the language used in a so-called Garrity
warning.  See Garrity, 385 U.S. at 496-97.

In short, the Select Board was entitled to demand that
Sullivan respond to questions related to his employment and the
charges leveled against him.  To the extent such compelled
testimony might have exposed Sullivan to criminal liability, he
was provided with a Garrity warning explaining that "neither his
self-incriminating statements, nor the fruits thereof will be
used against him in any criminal proceeding."  In re Waterman,
154 N.H. at 442.  Under those circumstances, the Board's request
that Sullivan respond to its questions did not violate any of
his constitutionally protected rights.  Nor were those rights
subsequently violated when the Board took into consideration -
as one factor among several - his refusal to testify or respond
to questions about the allegations leveled against him.  See
Dwan, 329 F.3d at 279-80 ("Under the case law, a negative
inference may be drawn by a public employer - and adverse action
taken - 'because of' an employee's refusal to answer questions
about job-related misconduct, so long as the inference is

plausible and (perhaps) other information also supports the adverse action.").

For the forgoing reasons, the court necessarily concludes that Sullivan's complaint fails to plausibly allege the essential elements of a viable claim that any of the defendants violated his federal procedural due process rights.

II.  Substantive Due Process.

Next, Sullivan asserts that defendants' conduct was so shocking and so malicious that it violated his substantive due process rights.  In support of that claim, he alleges that "Poirier manufactured a complaint of criminal conduct against Sullivan, based on Sullivan's conduct in his capacity as a law enforcement officer.  That Poirier fabricated this claim while he himself was acting in his capacity as a law enforcement officer, cements the shocking nature of Poirier's conduct as an actionable due process violation."  Plaintiff's Opposition Memorandum (document no. 10) at 13.  The complaint also alleges that Beijer conspired with Poirier to assist in his unlawful efforts to wrongfully terminate Sullivan's employment.

"The constitutional guarantee of substantive due process functions to protect individuals from particularly offensive

actions on the part of government officials." <u>Gonzalez-Droz v.</u> <u>Gonzalez-Colon</u>, 660 F.3d 1, 15-16 (1st Cir. 2011). To state a viable substantive due process claim, Sullivan must show that the acts complained of "were so egregious as to shock the conscience." <u>Pagan v. Calderon</u>, 448 F.3d 16, 32 (1st Cir. 2006). But, as the court of appeals has noted,

> There is no scientifically precise formula for
> determining whether executive action is - or is not -
> sufficiently shocking to trigger the protections of
> the substantive due process branch of the Fourteenth
> Amendment. Accordingly, the analysis will vary with
> the subject matter and the circumstances. It is,
> therefore, unsurprising that the requisite inquiry
> involves a comprehensive analysis of the attendant
> circumstances before any abuse of official power is
> condemned as conscience-shocking.
>
> The case law contains some helpful generalizations.
> We know, for example, that in order to shock the
> conscience, conduct must at the very least be "extreme
> and egregious," or, put another way, "truly
> outrageous, uncivilized, and intolerable." We also
> know that "mere violations of state law, even
> violations resulting from bad faith," do not
> invariably amount to conscience-shocking behavior.
> Rather, conscience-shocking behavior "must be
> stunning."

<u>Id</u>. (citations omitted). Necessarily, then, the threshold for stating a viable Fourteenth Amendment substantive due process claim is a high one, "lest the Constitution be demoted to what we have called a font of tort law." <u>County of Sacramento v.</u> <u>Lewis</u>, 523 U.S. 833, 847 n.8 (1998). <u>See also</u> <u>id</u>. at 848 ("It should not be surprising that the constitutional concept of

conscience-shocking duplicates no traditional category of common-law fault, but rather points clearly away from liability, or clearly toward it, only at the ends of the tort law's spectrum of culpability.").

In short, "The substantive due process guarantee does not serve as a means of constitutionalizing tort law so as to impose liability whenever someone cloaked with state authority causes harm." Pagan, 448 F.3d at 32 (citation and internal punctuation omitted).  Rather, a successful substantive due process challenge necessarily involves "an extreme lack of proportionality, as the test is primarily concerned with violations of personal rights so severe, so disproportionate to the need presented, and so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience." Gonzalez–Fuentes v. Molina, 607 F.3d 864, 881 (1st Cir. 2010) (citation and internal punctuation omitted).

Along those lines, the court of appeals has collected representative cases in which the plaintiffs have stated viable substantive due process claims:

>Among the cases in which plaintiffs have prevailed [on
>substantive due process claims] are those involving a
>student blinded in one eye when a coach intentionally
>struck him in the head with a metal weight; a
>teacher's fabrication of sexual abuse charges against
>a father, resulting in loss of contact with his child
>for three years; rape by a police officer in
>connection with a car stop; a 57-day unlawful
>detention in the face of repeated requests for
>release; police officers aiding a third-party in
>shooting the plaintiff; an intentional assault by a
>police officer who struck a pretrial detainee twice in
>the head and threatened to kill him; and a principal
>forcing his way into a room where a student was
>hiding, grabbing her from the floor, throwing her
>against the wall, and slapping her.  The conduct in
>these cases involve[ed] serious physical intrusions or
>sustained abuse.

Cummings v. McIntire, 271 F.3d 341, 346 (1st Cir. 2001)

(footnote and citations omitted).  See also Spencer v. Doran,

No. 18-CV-1191-LM, 2020 WL 4904826, at *6 (D.N.H. Aug. 20, 2020)

(collecting cases and noting that "official conduct is more

likely to meet the conscience-shocking' threshold if it involves

highly physically intrusive conduct, use of physical force or

violence, or interference with a protected relationship (e.g., a

parent-child relationship).").

    To be sure, the court of appeals has left open the

possibility that "verbal or other less physical harassment such

as that alleged by appellants might rise to a conscience-

shocking level." Cruz-Erazo v. Rivera-Montanez, 212 F.3d 617,

31

622 (1st Cir. 2000).  But, as this court (Barbadoro, J.) has

noted,

> A review of case law involving non-physical conduct,
> however, illustrates that the threshold for
> establishing the requisite abuse of government power
> is high.  See, e.g., Cruz-Erazo, 212 F.3d at 622-23
> (holding that months of harassment by police officers,
> which included threats of physical violence, insults,
> and the filing of unjustified charges, did not rise to
> the level of conduct that shocks the conscience);
> Pittsley v. Warish, 927 F.2d 3, 7 (1st Cir. 1991)
> (concluding that police conduct was "despicable and
> wrongful," but not conscience-shocking, where police
> officers repeatedly threatened to kill plaintiff and
> once threatened plaintiff's children with never seeing
> their father again); Phelps v. Bracy, Civ. Action No.
> 06-40090-GAO, 2007 WL 2872458, at *3 (D.Mass. Sept.
> 27, 2007) (allegations that a corrections officer
> threatened, yelled at, swore at, physically
> intimidated, and appeared to intend imminent harm to a
> civilly committed person were insufficient to shock
> the conscience).

Kraft v. Mayer, No. 10-CV-164-PB, 2012 WL 235577, at *5 (D.N.H.

Jan. 25, 2012).  See also Drake v. Town of New Bos., No. 16-CV-

470-SM, 2017 WL 2455045, at *7 (D.N.H. June 6, 2017) (holding

that plaintiff's claims that she was subjected to workplace

harassment and discrimination, false allegations of violating

the workplace harassment policy, and wrongful termination, as

well as her assertion that she was wrongfully and vindictively

placed on the New Hampshire "Laurie List" were insufficient to

support a viable substantive due process claim).

Here, Sullivan's claims do approach "the ends of the tort law's spectrum of culpability," Lewis, 523 U.S. 848, and the cases upon which he relies for support are based upon facts far more egregious than those alleged here.  Even generously construing the allegations of the complaint, this case involves assertions of fairly typical - though plainly actionable - workplace harassment and wrongful termination.  For example, even assuming, as alleged, that Poirier fabricated the factual basis for the criminal referral to the New Hampshire Attorney General, the ensuing investigation exonerated Sullivan, did not result in any criminal or civil charges, and did not result in the loss of any liberty interest (e.g., detention or arrest). See, e.g., Winslow v. Smith, 696 F.3d 716, 735 (8th Cir. 2012) ("False evidence or evidence derived from a reckless investigation only violates a criminal defendants' due process rights if it is used to deprive the defendant of her liberty in some way.  Indeed, if an officer fabricates evidence and puts that fabricated evidence in a drawer, making no further use of it, then the officer has not violated due process; the action did not cause an infringement of anyone's liberty interest.") (citations and internal punctuation omitted).

Similarly, Sullivan's claim that defendants, in bad faith and in retaliation for Sullivan's decision to report Poirier's

unprofessional conduct, published defamatory statements about him and made him the victim of an overarching campaign of retribution, are insufficient to amount to conscience-shocking behavior.  See generally Kraft, 2012 WL 235577, at *6 ("Even assuming that Kraft's termination resulted from Mayer's retaliatory animus and that other UNH administrators condoned the retaliatory termination, their bad faith motivation is insufficient to amount to conscience-shocking behavior.") (collecting cases).

Of course, "if true, plaintiff's allegations describe official misconduct that is deplorable and inexcusable.  That does not, however, necessarily raise it to the level of conscience-shocking required to make out a substantive due process claim."  Spencer v. Doran, No. 18-CV-1191-LM, 2020 WL 4904826, at *6–7 (D.N.H. Aug. 20, 2020).  As the court of appeals has repeatedly recognized,

> the requisite arbitrariness and caprice for a
> conscience-shocking executive action must be stunning,
> evidencing more than humdrum legal error.  Mere
> violations of state law, even violations resulting
> from bad faith, do not necessarily amount to
> unconstitutional deprivations of substantive due
> process.  Courts regularly have required something
> more egregious and more extreme.

DePoutot v. Raffaelly, 424 F.3d 112, 119 (1st Cir. 2005)
(citations and internal punctuation omitted). Such stunning,
extreme, and conscience-shocking conduct is not alleged in
Sullivan's complaint. As bad (and potentially unlawful) as
Poirier's and Beijer's (alleged) conduct was, it is not
actionable as a violation of Sullivan's federal substantive due
process rights.

### Conclusion

While Sullivan's pretermination hearing may have been
seriously flawed and, indeed, his discharge may have been
unlawful under state law, those deficiencies do not rise to the
level of a violation of his federally protected procedural or
substantive due process rights. Consequently, Defendants'
Motion for Judgment on the Pleadings on Counts Three and Four
(**document no. 9**) of plaintiff's complaint is necessarily granted
and Sullivan's procedural and substantive due process claims are
dismissed.

Because Sullivan's federal due process claims appear to
have formed the sole basis of this court's subject matter
jurisdiction, see 28 U.S.C. § 1331, and because the court has
dismissed those claims, the parties shall, on or before August

29, 2025, show cause why this matter should not be remanded to the Belknap County (New Hampshire) Superior Court.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

July 24, 2025

cc:  Counsel of Record